The WILMINGTON MEDICAL CENTER,
INCORPORATED, Plaintiff,

v.

Joseph BRADFORD and Delaware
Health Facilities Authority,
Defendants.

Supreme Court of Delaware.

Submitted Dec. 22, 1977.

Decided Jan. 16, 1978.

Rodney M. Layton and Wendell Fenton of Richards, Layton & Finger, Wilmington, for plaintiff, The Wilmington Medical Center.

Henry N. Herndon, Jr. and Edward M. McNally of Morris, James, Hitchens & Williams, Wilmington, for defendant, Joseph Bradford.

Richard L. McMahon of Potter, Anderson & Corroon, Wilmington, for defendant, Delaware Health Facilities Authority.

Before HERRMANN, C. J., DUFFY and McNEILLY, JJ.

HERRMANN, Chief Justice:

This certification from the Court of Chancery [1] originated in a declaratory judgment action brought to test the constitutionality of the Delaware Health Facilities Act, 16 *Del.C.* Ch. 97, (hereinafter "the Statute").

## I.

The certificate states the following undisputed facts:

"(a) By an Act effective July 1, 1973 (59 *Del.Laws,* Ch. 292) 16 *Del.C.* Ch. 97 was enacted for the stated purpose of '[providing] health care facilities within the State . . . with appropriate additional means to expand, enlarge, and establish health care, hospital and other related facilities.' 16 *Del.C.* Ch. 97 will hereinafter be referred to as 'the Statute'. The Statute created the Delaware Health Facilities Authority and granted to it the authority to finance health care projects and construct, alter and regulate such projects or designate a health care facility as its agent to do so.

"The Statute was passed by a vote of 28 yes, 10 no, and 3 not voting in the House of Representatives, and by a vote of 20 yes and one absent in the Senate.

"(b) By an act signed by the Governor on July 8, 1976 (60 *Del.Laws,* Ch. 565), 16 *Del.C.* § 9704 was amended to change the expiration dates of the terms of the members of the Authority.

"(c) By an act effective July 30, 1976 (60 *Del.Laws,* Ch. 661) 9 *Del.C.* § 2601 was amended to provide that the zoning regulations of New Castle County shall not apply to lands, buildings or other structures proposed to be used by or for a non-profit acute general hospital.

"(d) The following members of the Authority were appointed by the Governor on June 1, 1976: James Miles (term expiring June 30, 1977), Shirley Tarrant (term expiring June 30, 1981), Joan C. Wright (term expiring June 30, 1981), Richard G. Carrico (term expiring June 30, 1981), Arthur C. Annone (term expiring June 30, 1980) (resigned and succeeded by Rolf E. Eriksen, September 9, 1976), and Eugene DiSabatino (term expiring June 30, 1978). A sixth member, Norris Bunting (term expiring June 30, 1979) was appointed subsequent to July 8, 1976.

"(e) Plaintiff, The Wilmington Medical Center, Incorporated, is a non-profit corporation which owns and operates the principal hospitals located in the City of Wilmington.

"(f) Plaintiff, The Wilmington Medical Center, Incorporated, has made application to the Authority for the financing by the Authority under the Statute of construction and renovation of hospitals in New Castle County, pursuant to a plan which the Medical Center refers to as 'Plan Omega'. A copy of said application is attached to the Petition for Certification as Exhibit 'A'.

---

1. Supreme Court Rule No. 20(1) provides: "The Court of Chancery or the Superior Court may, on petition or on its own motion, certify to this Court for its decision a question or questions of law arising in any cause before it prior to the entry of final judgment therein whenever there are important and urgent reasons for an immediate determination of such question or questions by this Court."

"(g) Defendant Joseph Bradford is a resident taxpayer of the State of Delaware and New Castle County."

The following additional facts appear in the application referred to in subparagraph (f) above:

Of the major hospitals in Wilmington, the Medical Center operates 1104 beds; the other 2 hospitals operate 100 and 267 beds respectively. Under "Plan Omega", the Medical Center proposes to construct a 758-bed hospital in Stanton and to modernize the present Delaware Division of the Center in Wilmington. Upon completion thereof, the Memorial and General Divisions in Wilmington would be vacated under the Plan. The cost of the project would exceed approximately $87 million; of this, about $16 million would be raised through private donations and the remainder would be financed by tax-exempt revenue bonds issued by the Delaware Health Facilities Authority under the Statute.[2] The Authority's bonds would be paid with the proceeds from repayment of a loan from the Authority to the Medical Center. This debt would be secured by a mortgage on the new Stanton Hospital and on the Delaware Division Hospital. As additional security, the Medical Center would pledge its "gross receipts" (defined basically as all receipts, less gifts limited to a specific purpose). The Medical Center would repay the debt to the Authority, principal and interest, in the same manner as the payments on the Authority's bonds are due. The Medical Center would indemnify the Authority for all its expenses.

The ability of the Medical Center to repay the debt incurred would depend on the revenues it derives for its services. In 1975, the State of Delaware supplied about 4% of the Medical Center's $61,000,000 in operating income, i. e., over $2,400,000.

## II.

The following are the questions of law certified:

"(a) Does the Statute violate Article II, Section 16 of the Delaware Constitution for the reason that it contains subjects not expressed in its title or because it embraces more than one subject?

"(b) Does that part of 16 *Del.C.* § 9717 which exempts any bonds or notes issued under the Statute, their transfer and the income therefrom, from taxation of every kind by the State violate the tax uniformity requirement of Article VIII, Section 1 of the Delaware Constitution?

"(c) Does the Statute authorize that public funds be spent and public credit be pledged for a private purpose, and, if so, is this a violation of Article VIII, Sections 1, 3 and 4 of the Delaware Constitution?

"(d) Does the Statute authorize the Authority to borrow money and create debts on behalf of the State, in violation of Article VIII, Section 3 of the Delaware Constitution?

"(e) Does the Statute authorize the Authority to appropriate public money, issue or loan bonds of the State, or pledge the credit of the State to a corporation, in violation of Article VIII, Section 4 of the Delaware Constitution?

"(f) Does the Statute authorize the Authority to spend public money in violation of Article VIII, Section 6 of the Delaware Constitution?

"(g) Does the Statute authorize a pledge of the credit of the State by the guarantee or endorsement of the bonds or other undertakings of a corporation otherwise than pursuant to an Act of the General Assembly, passed with the concurrence of three-fourths of all the members elected to each House, in violation of Article VIII, Section 4 of the Delaware Constitution?

"(h) Did the appointment of the present members of the Authority violate the terms of the Statute, frustrate a legislative mandate expressed in the Statute, or constitute an unlawful attempt to legislate in violation of Article II, Section

2. The Authority is authorized by the Statute to make loans to any non-profit health care facility in Delaware duly licensed by the State Board of Health, and to issue tax-exempt bonds for the purpose. 16 *Del.C.* §§ 9703(5), 9705(a)(6) and (12), 9711, 9717.

1 of the Delaware Constitution, or have the present members been duly appointed?

"(i) Is 9 *Del.C.* § 2601, as amended by a bill (60 *Del.Laws* 661) signed July 30, 1976, unconstitutional for any of the following reasons?

"(1) As special legislation creating an unreasonable and arbitrary classification;

"(2) As a limitation of the zoning authority of New Castle County only;

"(3) As an act with no proper legislative purpose in excluding a particular class of hospitals from zoning requirements."

### III.

■ It is to be noted as a threshold observation that the defendant Bradford,[3] seeking to overthrow the Statute, has the burden of rebutting the presumption of validity and constitutionality with which every statute is cloaked. That burden has been summarized by this Court as follows, once the constitutional question has been determined to be "fairly debatable":

"Having reached that conclusion, we become mindful of the traditional self-restraint of this Court whenever it becomes engaged in testing the constitutionality of an act of the General Assembly. Such self-imposed limitation has been expressed by this Court in varying but consonant terms: Legislative acts should not be disturbed except in clear cases, and then only upon weighty considerations; a legislative enactment is cloaked with a presumption of constitutionality and should not be declared invalid unless its invalidity is beyond doubt. *Klein v. National Pressure Cooker Co.*, Del.Supr., 64 A.2d 529 (1949). Every presumption is in favor of the validity of a legislative act and all doubts are resolved in its favor; and if the question of the reasonable necessity for regulation is fairly debatable, legislative judgment must be allowed to

control. *State v. Hobson*, Del.Supr., 83 A.2d 846 (1951). There is a strong presumption of constitutionality attending a legislative enactment which, unless the evidence of unconstitutionality is clear and convincing, the court will be reluctant to ignore *State Highway Dept. v. Delaware Power & Light Co.*, Del.Supr., 167 A.2d 27 (1961). One who challenges the constitutionality of a statute has the burden of overcoming the presumption of its validity. *State v. Brown*, Del.Supr., 195 A.2d 379 (1963)." *Justice v. Gatchell*, Del.Supr., 325 A.2d 97, 102 (1974).

It is in the light of the foregoing criteria that each constitutional challenge presented here must be tested.

### IV.

It is contended by Bradford that the title to the Statute (see 59 *Del.L.* Ch. 292) violated *Del.Const.* Art. II, § 16.[4] The title is:

"An Act to Amend Title 16, Delaware Code, by Adding a New Part IX Providing For a Delaware Health Facilities Authority."

First, it is argued that the Statute embraces subjects not expressed in its title in that Title 16 previously dealt almost entirely with controlling potential threats to public health and treating or aiding those in need of special health care; thus, the argument goes, the reader was mislead and deceived as to the nature of the Authority being created. In support of this contention, Bradford cites: *Monaghan v. Lewis*, Del.Supr., 59 A. 948 (1905); *Opinion of the Justices*, Del.Supr., 194 A.2d 855 (1963); *Wilmington Trust Co. v. Highfield*, Del. Supr., 153 A. 864 (1931); *In re Cypress Farms Ditch*, Del.Super., 180 A. 536 (1935); *Davis v. Board of Sup'rs.*, Mich. Supr., 64 Mich. 404, 50 N.W. 862 (1891).

---

3. The defendant Authority adopts the position and arguments of the Center.

4. *Del.Const.*, Art. II, § 16 provides:

"No bill or joint resolution, except bills appropriating money for public purposes, shall embrace more than one subject, which shall be expressed in its title."

Secondly, it is argued that the Statute embraces more than one subject, in violation of Art. II, § 16, in that it not only creates the Authority, but it also purports to divest certain taxing powers of New Castle County. In support of this argument, *Schneider v. City of Folkston,* Ga. Supr., 207 Ga. 434, 62 S.E.2d 177 (1950) and *Bird Key Corp. v. City of Sarasota,* Fla. Supr., 54 So.2d 245 (1951) are cited.

None of the cited authorities impels invalidation of the Statute. We are of the opinion that the title of the Statute is neither fatally deceptive and misleading nor void for double subject matter.

The purposes of Art. II, § 16 have been well stated as follows:

"Uniformly it has been held that the purpose of this section of the Constitution is to insure that the titles of bills shall be sufficiently comprehensive to members of the General Assembly, fair and reasonable notice of the subject matter of the proposed legislation. Fundamentally, it is designed to prevent deception of the general public and the members of the General Assembly by titles to bills which give no adequate information of the subject matter of the bills." *Opinion of the Justices,* Del.Supr., 194 A.2d 855, 856 (1963).

Similarly,

"The requirements of § 16 are satisfied if the title is sufficiently informative as to put on notice parties interested in the general subject matter in such manner as would lead them to inquire into it if they wished. The fundamental purpose of § 16 is to prohibit the passage of 'sleeper' legislation. *Opinion of the Justices,* Del. Supr., 177 A.2d 205, 208 (1962)." *Opinion of the Justices,* Del.Supr., 315 A.2d 580, 583 (1974).

See also *Clendaniel v. Conrad,* Del.Supr., 83 A. 1036 (1912).

Those purposes have been fulfilled sufficiently to withstand this challenge. The Constitution does not require the title to a bill to be either an index to its details or a synopsis of the means by which its object is to be accomplished. *du Pont v. Director of Division of Revenue, etc.,* Del. Supr., 347 A.2d 653 (1975). And in interpreting the "one subject" requirement of Article II, § 16, "[m]any things may be included in the body of an Act which are, in themselves, matters of detail concerning the subject as expressed in the title." *State ex rel. Morford v. Emerson,* Del.Super., 8 A.2d 154, 159 (1939); accord, *State ex rel. Craven v. Schorr,* Del.Supr., 131 A.2d 158 (1957).

We hold the Statute not violative of Article II, § 16.

## V.

It is contended by Bradford that the provision of § 9717[5] of the Statute exempting from taxation any bonds or notes issued by the Authority, violates the uniformity-of-taxes provision of *Del.Const.,* Art. VIII, § 1.[6] The crux of this argument is that the exemption[7] is unreasonable and discriminatory in that non-profit health care facilities which obtain financing under the Statute would have the benefit of tax-exempt bonds as an aid in raising needed funds, whereas other non-profit health facilities, which do not avail themselves of the Statute for financing would not have such advantage; and, the argument goes, there is no rational basis for such discrimination which results in favoritism of one health care facility over another. The only authority cited in support of this position is

"All taxes shall be uniform upon the same class of subjects * * *".

7. The certification, as amended, does not include the question of whether real property owned by the Authority, its agent or lessee, is exempt from taxation by § 9717; for that reason, we express no opinion on that question.

5. 16 *Del.C.* § 9717 provides in pertinent part: "* * * any bonds or notes issued under this chapter, their transfer and the income therefrom, shall at all times be free from taxation of every kind by the State and by the municipalities and other political subdivisions in the State."

6. *Del.Const.,* Art. VIII, § 1, provides in pertinent part:

**1344** ■■■■■■■■■■■■■

*Village of Moyie Springs, etc. v. Aurora Mfg. Co.,* Idaho Supr., 82 Idaho 337, 353 P.2d 767 (1960).

The short answer to this contention is that the "class of subjects" exempted by the provision of § 9717, here under scrutiny, are the bonds and notes issued by the Authority—not health care facilities that may be benefited thereby. All holders of Authority bonds and notes will be uniformly entitled to the tax exemption on the transfer and income derived therefrom. No exception or distinction is made by the Statute and the impact of the exemption is uniform as to all bonds and notes issued and all holders thereof. Thus, because the exemption created by the Statute applies uniformly to the entire class of subjects covered, there is no violation of the uniformity requirement of Art. VIII, § 1 by reason of the tax exemption provision of § 9717 here challenged.

But assuming, *arguendo,* some merit in Bradford's contention that there would be tax discrimination here as between nonprofit health care facilities, we pause to put that question to rest:

■ The test of constitutionality under the tax-uniformity provision of Art. VIII, § 1 is the reasonableness of the classification. *Tri-State Amusement, Inc. v. State Tax Dept.,* Del.Supr., 254 A.2d 228 (1969). In *Aetna Casualty & Surety Co. v. Smith,* Del.Supr., 131 A.2d 168, 177 (1957), this Court stated the test as follows:

"There is of course a presumption that the statute is constitutional. Legislatures have a wide discretion in the matter of classification for the purpose of taxation which the courts will not disturb unless the statute is clearly arbitrary. * * * The existence of facts to support the classification of the legislature must be assumed if any set of facts can

reasonably be conceived which will sustain such classification. * * * Generally, each case necessarily depends upon its own circumstances."

In § 9717, the General Assembly made the policy pronouncement that the activities of the Authority ". . . will be in all respects for the benefit of the people of this State, for the increase of their commerce, welfare and prosperity, and for the improvement of their health and living conditions . . .." This statement echoes the public policy underlying the Statute set forth in § 9701 of the Statute.[8]

■ The only entities entitled to assistance under the Statute are "nonprofit health care facilit[ies] within the state licensed by the State Board of Health." § 9703(5). It is this entire class that is benefited by the Statute. It is entirely reasonable, in our opinion, for the General Assembly to recognize all such non-profit health care facilities which apply for assistance under the Statute as a "class of subjects" under Article VIII, § 1, and to exempt from taxation bonds issued by the Authority for such class.

Bradford's reliance upon the *Village of Moyie Springs* case is misplaced. In that case, the Court held that a statute authorizing municipalities to issue tax-free revenue bonds, the proceeds from the sale of which would be used to acquire and construct industrial facilities for manufacturing concerns, violated a provision of the Idaho Constitution that the Legislature could "allow such exemptions from taxations * * * as shall seem necessary and just". The reason for such holding was stated as follows:

"An exemption which arbitrarily prefers one private enterprise operating by means of facilities provided by a munici-

---

8. § 9701 provides:

"It is hereby declared that for the benefit of the people of the State, the increase of their commerce, welfare and prosperity and the improvement of their health and living conditions, it is essential that health care facilities within the State be provided with appropriate additional means to expand, enlarge and establish

health care, hospital and other related facilities; and that it is the purpose of this chapter to provide a measure of assistance and an alternative method to enable facilities in the State to provide the facilities and structures which are sorely needed to accomplish the purposes of this chapter, all to the public benefit and good, to the extent and manner provided herein."

pality, over another engaged, or desiring to engage, in the same business in the same locality, is neither necessary nor just." 353 P.2d at 775.

The *Moyie Springs* case was recently distinguished in *Board of County Commissioners of Twin Falls County, Idaho v. Idaho Health Facilities Authority*, Idaho Supr., 96 Idaho 498, 531 P.2d 588 (1975), wherein the Idaho Supreme Court held:

> "All private non-profit health institutions and all publicly operated health institutions are eligible to participate in the programs of the Authority. . . . Thus, the authority does not fall within the foregoing prohibition announced in the *Moyie Springs* case."

Similarly, in the instant case, there is no arbitrary classification. All licensed non-profit health care facilities in the State are eligible to participate under the Statute in the programs of the Authority; none is barred. This is a reasonable legislative classification and, as a matter of law, favors no non-profit health facility over another.

The Statute does not contravene the uniformity-of-taxation provision of Article VIII, § 1.

### VI.

It is contended by Bradford that the Statute, as applied in the instant case, would permit the borrowing of money and creation of debt on behalf of the State, and the pledging of the credit of the State, without the concurrence of three-fourths of all the members elected to each House,[9] in violation of *Del.Const.*, Art. VIII, §§ 3 [10] and 4.[11]

Bradford argues that a debt would be created on behalf of the State, under the facts of this case, in that the State may be obliged to continue its present subsidy of about 4% of the Medical Center's annual operating income in order to enable the Center to meet its proposed annual bonded indebtedness.

Bradford also argues that, as a practical matter, the State's credit would be pledged in this situation because (1) in the event of a default, the public's essential need for the Medical Center's hospital facilities may oblige the State to "bail out" the situation to avoid a foreclosure; and (2) the mere use of the State's name in the bond issue would constitute a moral obligation of the State's credit in the eyes of the bond purchaser, any no-recourse language in the bond to the contrary notwithstanding.

Finally, it is contended by Bradford that in selling its bonds, the Authority would be borrowing money as an agent of the State, in violation of the mandate of Art. VIII, § 3 that "[n]o money shall be borrowed * * by or on behalf of the State * * *" without the requisite vote.

In response, the Medical Center and the Authority point to the explicit no-recourse provisions of § 9713 of the Statute:

> "Bonds or notes issued under this chapter shall not be deemed to constitute a debt or liability of the State or of any political subdivision thereof, other than the Authority, or a pledge of the faith and credit of the State or of any such political subdivision, other than the Authority, but shall be payable solely from the funds herein provided therefor. All such bonds or notes shall contain on the face thereof a statement to the effect

---

**9.** It will be recalled that the Statute passed in the House by 28 votes—3 votes short of the concurrence of three-fourths of the House. In the Senate, it was 1 vote short of being unanimous.

**10.** Art. VIII, § 3 provides:

"No money shall be borrowed or debt created by or on behalf of the State but pursuant to an Act of the General Assembly, passed with the concurrence of three-fourths of all the members elected to each House, * * *".

**11.** Art. VIII, § 4 provides:

"No appropriation of the public money shall be made to, nor the bonds of this State be issued or loaned to any county, municipality or corporation, nor shall the credit of the State, by the guarantee or the endorsement of the bonds or other undertakings of any county, municipality or corporation, be pledged otherwise than pursuant to an Act of General Assembly, passed with the concurrence of three fourths of all the members elected to each House."

that neither the State nor any political subdivision thereof other than the Authority shall be obligated to pay the same or the interest thereon except from revenues of the project or projects or the portion thereof for which they are issued and that neither the faith and credit nor the taxing power of the State or of any political subdivision thereof other than the Authority is pledged to the payment of the principal of or the interest on such bonds. The issuance of bonds under this chapter shall not directly or indirectly or contingently obligate the State or any political subdivision thereof to levy or to pledge any form of taxation whatever therefor, or to make any appropriation for their payment. Nothing contained in this section shall prevent or be construed to prevent the Authority from pledging its full faith and credit or the full faith and credit of a participating facility to the payment of bonds or issue of bonds authorized pursuant to this chapter."

### A.

■ The annual subsidy contention is without merit. The Statute neither creates a State debt nor authorizes one in this connection. The subsidy would be no more a debt-obligation in the future than it has been in the past. The approximately 4% subsidy here involved has been, and if needed under the Plan may continue to be, a voluntary annual appropriation by the Legislature to help fulfill an essential public need. Any renewal of the annual subsidy would be the State's chosen means of financing an important segment of public health care services. In any event, we may not declare the Statute unconstitutional on the basis of speculation of what the Medical Center's future financial needs may be or conjecture as to decisions future General Assemblies may make about providing public health care services. And, in any event, the concurrence of three-fourths of the members elected to each House of the General Assembly will be required to authorize any annual subsidy. In that manner, and at those times, the mandates of Art. VIII, §§ 3 and 4 will be met.

### B.

■ By the pledge-of-State-credit argument, Bradford seeks to rebut the presumption of the constitutionality of the Statute upon the basis of possible "moral" obligation and other hypothetical and conjectural grounds. A constitutional challenge may not be thus sustained.

First to be noted in this connection, the constitutional restriction of Art. VIII, § 3 is expressly related to "pledge of the credit of the State by the guarantee or the endorsement of the bonds or other undertakings of any * * * corporation." No such guarantee or endorsement is contemplated by the Statute; indeed, the explicit provisions of § 9713 are directly antithetical to such notion. "Historically, the term 'credit' in the typical constitutional finding of credit clause referred to a surety relationship between the public body and the * * * business primarily liable on the incurred debt." 50 Washington L.Rev., pp. 440, 449 (1975); Pinsky, *State Constitutional Limitations on Public Industrial Financing: An Historical and Economic Approach*, 111 U.Pa.L.Rev. 265, 277–8 (1963); *Green v. City of Mt. Pleasant*, Iowa Supr., 256 Iowa 1184, 131 N.W.2d 5, 15 (1964). The "guarantee" and "endorsement" provisions contained in our Art. VIII, § 3 are consonant with that historical surety relationship; no such relationship is lawfully possible under the Statute.

■ Moreover, the "guarantee" and "endorsement" provisions of Art. VIII, § 3 are consonant with the generally prevailing rule that there can be no pledge of state "credit" without the incurring of a public legal liability guaranteed by the taxing power of the state; and our "guarantee" and "endorsement" requirements are consistent, too, with the ordinary and historical meaning of the constitutional terms used. 50 Washington Law Review pp. 440, 448, f. n. 29 (1975); *e. g.*, City of Santa Clara v. Von Raesfeld, Cal.Supr., 3 Cal.3d 239, 90 Cal.Rptr. 8, 474 P.2d 976 (1970); *Reed v. City of Cheyenne*, Wyo.Supr., 429 P.2d 69

(1967); *Northeast Shoe Co. v. Industrial and Recreational Fin. Approval Bd.,* Me. Supr., 223 A.2d 423 (1966); *Basehore v. Hampden Indus. Development Authority,* Pa.Supr., 433 Pa. 40, 248 A.2d 212 (1968); *Allardice v. Adams Co.,* Colo.Supr., 173 Colo. 133, 476 P.2d 982 (1970); *Wilson v. Board of County Commissioners,* Md.Ct. App., 273 Md. 30, 327 A.2d 488 (1974).

In *Opinion of the Justices,* Del.Supr., 177 A.2d 205 (1962), it is stated that "financing by revenue bonds [is] not guaranteed by the state" and that such financing does not violate *Del.Const.,* Art. VIII, § 3. And in *Julian v. Delaware Health Facilities Authority,* (unreported) (Del.Ch. C.A. 5187–1975), referring to the Authority and Medical Center here involved, the Chancellor stated:

> "Any notes or bonds issued by the Authority 'shall not be deemed to constitute a debt or liability of the State'—and the mere possibility that public moneys may be needed in the future, as in the case of the recent Farmers' Bank matter, does not change the nature of the moneys now in issue".

The great weight of authority supports the validity of no-recourse revenue bonding legislation, as contrasted with general obligation bonds, when challenged as an unconstitutional "lending" or "pledging" of the public body's credit. It appears that such legislation is upheld in approximately 38 states. See 50 Washington L.Rev. pp. 440, 447–8, fns. 28, 29 (1975). For example:

In *Board of County Commissioners of Twin Falls, etc. v. Idaho Health Facilities Authority,* Idaho Supr., 96 Idaho 498, 531 P.2d 588 (1975), as in the instant case, tax exempt financing for non-profit hospitals was provided by statute under which the Idaho Health Facilities Authority was authorized to enter into contracts with hospitals by which the Authority would obtain a pledge of revenues of the hospital, and such other security as provided in the agreement, in return for money to be advanced to the hospital; and the Authority would obtain the money advanced by selling tax-exempt notes. Under the Idaho statutory plan, as

in the instant case, no state tax money would be involved. In *Twin Falls,* the Idaho Supreme Court made short shrift of the pledge-of-State-credit contention (as well as several others raised here) and held their Statute constitutional.

In *Schureman v. State Highway Commission,* Mich.Supr., 377 Mich. 609, 141 N.W.2d 62 (1966), a statute authorizing revenue bonds for a highway commission was held to be not subject to a state constitutional provision limiting the extension of the state's credit. The Michigan Supreme Court has stated:

> "The overwhelming weight of judicial opinion in this country is to the effect that bonds, . . . issued by states, cities, counties . . . if such particular bonds are secured and payable only from the revenues to be realized from a particular utility or property, acquired with the proceeds of the bonds or obligations, do not constitute debts of the particular state, . . . within the definition of 'debts' as used in the constitutional provisions of states having limitations as to the incurring of indebtedness." *Ziegler v. Witherspoon,* Mich.Supr., 331 Mich. 337, 49 N.W.2d 318 (1951), quoting *California Toll Bridge Authority v. Wentworth,* Cal.Supr., 212 Cal. 298, 298 P. 485 (1931).

And in *Nohrr v. Brevard County Educational Facilities Authority,* Fla.Supr., 247 So.2d 304 (1971), the Florida Supreme Court construed a section of that state's Educational Facilities Authority Act which is like § 9713 of the Statute. The Florida statute had been challenged under a section of the state constitution which prohibited the state or local government from lending or using its taxing power or credit for the benefit of any association, corporation, or person except in certain circumstances. The Court held that the Act did not violate those provisions:

> "The word 'credit' as used in Florida Constitution, Art. VII, § 10 (1968), implies the imposition of some new financial liability upon the State or a political subdivision which in effect results in the cre-

ation of a State or political subdivision debt for the benefit of private enterprises.

"In order to have a gift, loan or use of public credit, the public must be either directly or contingently liable to pay something to somebody. Neither the full faith credit nor the taxing power of any political subdivision thereof is pledged to the payment of the principal of, or the interest on, these revenue bonds. The purchasers of the revenue bonds may not look to any legal or moral obligation on the part of the state, county, or authority to pay any portion of the bonds." 247 So.2d at 309.

See also: *Opinion of the Justices*, Mass. Supr., 354 Mass. 779, 236 N.E.2d 523 (1968); *Board of County Commissioners v. Idaho Health Facilities Authority, supra; Clayton v. Kervick*, N.J.Supr., 52 N.J. 138, 244 A.2d 281 (1968); 64 Am.Jur.2d *Public Securities and Obligations*, §§ 81–83, 95–97; *State Housing Authority v. Depositors Trust Company*, Me.Supr., 278 A.2d 699 (1971); *Johnson v. Pennsylvania Housing Finance Agency*, Pa.Supr., 453 Pa. 329, 309 A.2d 528 (1973); *W. A. Foote Memorial Hospital, Inc. v. Kelley*, Mich.Supr., 390 Mich. 193, 211 N.W.2d 649 (1973); *State ex rel. Farm Elect. Coop., Inc. v. State Env., I. A.*, Mo. Supr., 518 S.W.2d 68 (1975); *Uhls v. State*, Wyo.Supr., 429 P.2d 74 (1967). Compare *Fort Sanders Presby. Hospital v. Health & Ed. Fac. Bd.*, Tenn.Supr., 224 Tenn. 240, 453 S.W.2d 771 (1970).

\* \* \* \* \* \*

In this connection, Bradford relies upon a distinct minority view represented by the cases he cites: *Port of Longview, etc. v. Taxpayers, etc.*, Wash.Supr., 84 Wash.2d 475, 527 P.2d 263 (1974); *State v. City of York*, Neb.Supr., 164 Neb. 223, 82 N.W.2d 269 (1957); *State v. Brand*, Ohio Supr., 176 Ohio St. 44, 197 N.E.2d 328 (1964); and *Stanley v. Dept. of Conservation and Development*, N.C.Supr., 284 N.C. 15, 199 S.E.2d 641 (1973).

In *Port of Longview*, arising under a constitutional provision substantially different from ours, it was held that statutes authorizing the issuance of pollution control revenue bonds violated the constitutional provision [12] by permitting the lending of public credit for private purposes. This case is thus inapposite on its facts. For a full critique of *Port of Longview*, however, see 50 Wash.L.Rev. 440 (1975). There, noting that *Longview* relied upon *City of York* and *Brand* (upon which Bradford here relies), the commentator termed the *York* decision "aberrant" because it held that liability might be imposed upon the public body in the event of default despite the "no recourse" nature of the bonds.[13] As to *Brand*, the commentator noted that the Court relied extensively upon a constitutional clause (without counterpart in Delaware) which limited public debt to the aggregate of both "direct and contingent" debt. and in the *Stanley* case, the Court invalidated a pollution control bonding scheme holding that since the issuance of the bonds directly benefited private industry with only "incidental or secondary" benefit to the public, such issuance violated the "public purpose" provision of the North Carolina Constitution. This case, too, is wholly inapposite on the facts.

---

12. "No county, city, town or other municipal corporation shall hereafter give any money, or property, or loan its money, or credit, to or in aid of any individual, association, company, or corporation \* \* \* ".

13. In *State ex rel. Beck v. City of York, supra*, the Court stated:

"The issuance of the bonds in the name of the city for the payment of the cost of the project evidences the fact that the credit of the city has been extended. The city is the payer of the bonds and it is primarily liable for their payment. The bonds become the obligations of the city. . . . A failure of payment is a default by the city. . . . If evidences of indebtedness by interested private persons are inadequate and revenue bonds of the city are sufficient, either the credit of the city has been extended or their purchasers are victims of a base delusion." 82 N.W.2d at 272.

We find those views, based as they are on extra-legal considerations, unacceptable in view of the express no-recourse language of the Statute, explicitly negating the legal liability and surety relationship contemplated by Art. VIII, § 4, and implemented by the Statute.

For the foregoing reasons, we find persuasive none of the authorities cited by Bradford for the "pledge-of-credit" constitutional challenge.

Nor do we find persuasive, as sufficient support for this constitutional challenge, the authorities cited for the proposition that, as a practical matter, the use of the State's name constitutes a moral pledge of the State's credit in the eyes of the bondholder, even though each bond, on its face, is designated to be of the no-recourse type. E. g., *Wadsworth v. Santaguin City*, Utah Supr., 83 Utah 321, 28 P.2d 161 (1933). As previously stated, this is an extra-legal consideration urged on the basis of an undemonstrated detrimental effect of a possible default upon the State's general reputation and credit rating. We find this extra-legal, moral concept inconsistent with the historic and time-honored legal liability and surety relationship contemplated by Article VIII, § 4 and implemented by this Statute.

### C.

■■■ We find no merit in the contention that the Statute authorizes a borrowing "by or on behalf the State", within the meaning of Art. VIII, § 3. Any such concept is expressly negated by the clear and unequivocal statement, required to be placed on the face of the documents by § 9713, that bond or notes issued by the Authority "shall not be deemed to constitute a debt or liability of the State * * * or a pledge of the faith and credit of the State."

While the Authority may be a State agency created to encourage the development of health-care facilities, it may not legally act as an agent of the State in its borrowing function under the provisions of the Statute. There is no authority, express or implied, for the Authority to borrow money as agent for the State. As heretofore demonstrated by the great weight of authority, the State does not become indebted, either as principal or surety, on no-recourse revenue notes and bonds such

as are contemplated here. Since the State may not become indebted under the Statute by any act of the Authority, it cannot be said that the Statute authorizes a borrowing "by or on behalf of the State" within the purview of Art. VIII, § 3. See 1897 *Constitutional Debates* pp. 1415–17; 1486–94; 1520–28.

The authorities from other jurisdictions cited by Bradford in support of this contention constitute the minority view which we have discussed above and found unacceptable. This Court's decision in *Wilmington Housing Authority v. Williamson*, Del.Supr., 228 A.2d 782 (1967) is inapposite.

\* \* \* \* \* \*

We conclude that the creation-of-State-debt and the pledge-of-State-credit challenges, based as they are upon hypothesis and conjecture and minority view, fail to overcome the strong presumption of constitutionality with which the Statute is cloaked.

We hold that the Statute is not violative of Article VIII, §§ 3 or 4.

### VII.

■■■ It is contended by Bradford that the Statute violates Art. VIII, § 6 [14] in that the funds raised by the Authority are public funds permitted by the Statute to be expended without the required appropriation by the General Assembly. We find no merit in this argument.

Monies in the "treasury", within the meaning of the constitutional term, are those in the custody and control of the State Treasurer. *Opinion of the Justices*, Del.Supr., 315 A.2d 580 (1974). The funds here involved would not pass through the State Treasury; they would be segregated and handled as trust funds by the trustee designated under § 9712 of the Statute.

The generally accepted concept in this regard is the "conduit theory," originated by the U. S. Treasury Department in its

14. *Del.Const.* Art. VIII, § 6 provides in pertinent part:

"No money shall be drawn from the treasury but pursuant to an appropriation made by Act of the General Assembly; * * *."

consideration of the tax positions of the parties involved in the issuance of tax exempt revenue bonds. Under this theory, the Authority or municipality is deemed to be merely a conduit through which the bond proceeds pass to the borrower and the premiums pass to the bond purchasers. See 50 Wash.L.Rev. 440, 445, 460 (1950). The authorities cited by Bradford in support of this challenge, *Washington State Higher Education Assistance Authority v. Graham,* Wash.Supr., 84 Wash.2d 813, 529 P.2d 1051 (1974) and *State v. City of York, supra,* were based upon the reasoning that the bond proceeds become public funds upon passing through the public treasury. Those cases are inapposite upon their facts.

There is no violation of Art. VIII, § 6.

## VIII.

It is contended by Bradford that the Statute unconstitutionally authorizes that public funds be spent and public credit be pledged for a private purpose, and unlawfully delegates to the Authority the legislative power to create State debt, to pledge State credit, and to expend public funds.

Since it has been concluded that no such authority or power is vested in the Authority under this Statute, these contentions fall.

## IX.

It is contended by Bradford that the Governor failed to comply with the provision of § 9704(a) of the Statute, requiring him to appoint the Authority's initial members to terms "expiring on June 30, 1974, 1975, 1976, 1977, 1978 respectively", in that none of the initial terms expired before 1977 and only two were appointed to terms expiring before 1979. It is argued that, therefore, all of the initial appointments made on June 1, 1976 were void.

The Medical Center and the Authority counter by pointing out that on July 8, 1976, § 9704 was amended to read as follows:

---

**15.** 9 *Del.C.* Ch. 30 pertains to regulation of subdivision of all land in New Castle County not within the corporate limits of any city or

"The terms of the members of the Authority first appointed shall be designated by the Governor to commence on June 1, 1976, and to expire, respectively, 1 on June 30 in each of the years 1977, 1978, 1979, and 1980 and 3 in the year 1981."

Manifestly, the Legislature intended the July 8, 1976 amendment to apply retroactively to the Authority members whose terms commenced on June 1, 1976. No other reasonable meaning may be ascribed to the amendment. "While courts do not favor retroactive legislation, effect is impelled if, as here, the retrospective legislative intent is unmistakable." *Price v. All American Engineering Company,* Del.Supr., 320 A.2d 336, 341 (1974). This principle overcomes Bradford's argument that the appointments being void, they could not be revived retroactively.

We hold the appointments valid under § 9704, as amended.

## X.

On June 30, 1976, 9 *Del.C.* § 2601 was amended (60 *Del.L.* Ch. 661) to add the following proviso:

"The county government may, in accordance with the conditions and procedure specified in this chapter, regulate [various land and building uses, locations, and sizes], in any portion or portions of New Castle County which lie outside of incorporated municipalities, *provided, however, that no such regulation or regulation promulgated pursuant to Chapter 30 of this Title* [15] *shall apply to any lands, buildings, or other structures proposed to be used by or for any non-profit corporation organized under the laws of this State and engaged at the time of such proposal in the operation in this State of one or more acute general hospital facilities for the purpose of such or similar operations, or to any lands, buildings, or other structures of such corporation devoted to such operations. \* \* \**" (emphasis supplied)

---

town by the Regional Planning Commission of New Castle County.

Bradford contends that the limitation upon the zoning authority of a County, concededly within the power and authority of the General Assembly as a general rule, was unlawful here. The argument is that the proviso, withdrawing non-profit general hospital facilities from the zoning control of New Castle County, is an arbitrary and unreasonable exercise of the police power as to New Castle County in that the same limitation was not imposed upon the zoning powers vested in the governments of Kent and Sussex Counties.

We find no merit in this contention. The General Assembly is empowered by *Del. Const.*, Art. II, § 25 "to enact laws under which * * * the County of Sussex and the County of Kent and the County of New Castle may adopt zoning ordinances, laws or rules * * *". There is no requirement that such laws be similar or uniform among the 3 Counties.

Those challenging the validity of a zoning change have the burden of showing clearly that the change is not reasonably related to the public health, safety, and welfare; and where the reasonableness of the change is "fairly debatable", the duty of the Court is to sustain the change, even though there may be disagreement as to the wisdom of the change. *Willdel Realty, Inc. v. New Castle County*, Del.Supr., 281 A.2d 612 (1971); *McQuail v. Shell Oil Company*, Del.Supr., 183 A.2d 572 (1962).

We find no basis for labeling § 2601 an unreasonable and arbitrary exercise of police power. Bradford cites no direct authority for this challenge. His sole argument is that populous New Castle County needs zoning regulation more than either of the other Counties and, therefore, it was arbitrary and unreasonable to make the proviso, added to § 2601 by the amendment, applicable to New Castle County alone. This challenge falls far short of what it takes to overcome the presumption of constitutionality of § 2601. Again, here, Bradford fails to sustain his burden of establishing, clearly and convincingly and beyond doubt, the unconstitutionality of the Statute he seeks to question.

We hold 9 *Del.C.* § 2601 not unconstitutional for violation of the police powers of the State.

**XI.**

Upon the bases of the foregoing, all questions certified are answered in the negative.