STATE of Delaware

v.

James L. BLOUNT, Jr., Defendant.

Superior Court of Delaware, New Castle County.

Submitted: Jan. 31, 1984.
Decided: Feb. 3, 1984.

Eugene M. Hall, State Prosecutor, and James B. Ropp, Deputy Atty. Gen., Dept. of Justice, for State.

James A. Rambo and Thomas L. Little, Wilmington, for defendant.

O'HARA, Judge.

Defendant, James L. Blount, Jr., charged with the capital crime of Murder in the First Degree under 11 *Del.C.* § 636, has moved for an order of this Court directing that the guilt phase of his pending trial be conducted before a separate jury from the penalty phase, should the penalty hearing become necessary. The underlying thrust of defendant's motion is a contention that the *manner* in which a jury is chosen in a capital case, under the applicable Delaware statute, is constitutionally infirm. The Court disagrees.

Title 11, *Del.C.* § 3301 "Examination upon voir dire in capital cases" provides:

> When a juror is called in a capital case, he shall be first sworn or affirmed upon the voir dire and then asked, under the direction of the court, if he has formed or expressed any opinion in regard to the guilt or innocence of the prisoner at the bar. If his answer is in the negative, he shall be sworn as a juror in the case, *unless he has conscientious scruples against finding a verdict of guilty in a case where the punishment is death, even if the evidence should so warrant him,* or unless he shall be peremptorily challenged, challenged for cause or excused by consent of counsel on both sides. *If his answer to the question be in the affirmative, he shall be disqualified to sit in the case, unless he shall say, upon his oath or affirmation, to the satisfaction of the court, that he feels able, notwithstanding such an opinion, to render an impartial verdict upon the law and the evidence, in which event he shall be a competent juror,* if not otherwise disqualified, challenged or excused. (Emphasis added).

The *voir dire* procedures prescribed by this statute track the guidelines of the United States Supreme Court in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Under *Witherspoon,* a "death-qualified" jury is obtained by excluding potential jurors, for cause, from participating in deciding the defendant's guilt or innocence, if, on *voir dire,* they express adamant opposition to the death penalty such that under no circumstances could they return a sentence of death after having found the defendant guilty, i.e., they would "automatically" vote against the death sentence without regard to the evidence in the case.

This group of prospective jurors has been termed the "*Witherspoon* excludables" and actually consists of two sub-groups. The first sub-group is those prospective jurors who state that they would be unable to impartially try the issue of the defendant's guilt/innocence upon the basis of the evidence and the law, i.e., those who would say "I could never vote for the death penalty and, therefore, I could *not* vote a defendant

guilty, regardless of the evidence, if I know that someone else might impose the death penalty if he is convicted." The second sub-group consists of those prospective jurors who would say that they *could* (and swear that they would) make an impartial decision as to guilt/innocence based on the law and evidence, regardless of their inability to impose the death sentence under any circumstances.

At this point it is important to emphasize what the defendant in this case is *not* seeking. The defendant concedes that the State has the right to death-qualified jurors at the *penalty* phase of the trial, assuming the defendant is found guilty. Thus, the State's interest in obtaining a capital sentence in any appropriate case is not challenged. Also, the defendant readily concedes that the State has the right to exclude, at the guilt determination phase of the trial, all prospective jurors who state that their opposition to the death penalty would prevent them from reaching an impartial decision as to the defendant's *guilt*. This is merely a specific example of the general exclusion of jurors who cannot obey the law in making their decision. Thus, the State's interest in obtaining a fair trial of the issue of guilt similarly is not challenged.

With these fine distinctions in mind, the defendant seeks an order from this Court prohibiting the exclusion, at the *guilt determination phase,* of prospective jurors who are unable to vote for the death penalty at the *penalty phase* of the trial, but who could impartially try the issue of *guilt.* Defendant suggests that the simple solution to the problem would be to permit such jurors to sit on the guilt phase of the trial. Thereafter, assuming a finding of guilt, a second jury, would be selected, "cleansed" of any jurors who could not, under any circumstances, impose capital punishment. This second jury would determine the question of the application of the death penalty. In support of this position, defendant argues that 1) those persons who could not vote for

the death penalty but who could impartially try the issue of guilt comprise a distinctive group in the community, with distinctive attitudes concerning basic criminal justice principles, and 2) that the exclusion of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community, and 3) that this underrepresentation (actually nonrepresentation) is due to systematic exclusion of the group in the jury selection process.

Defendant urges that excluding from the guilt phase those jurors who could find guilt but who could not impose the death sentence afterwards 1) violates his right to a fair and impartial jury which is a reasonable representation of a fair cross-section of the community, and 2) violates his rights to due process of law under the Sixth and Fourteenth Amendments to the United States Constitution and Article I, § 7 of the Delaware Constitution.

In 1980, the Delaware Supreme Court had occasion to consider an argument similar to the defendant's in the case at bar. In *Hooks v. State,* Del.Supr., 416 A.2d 189 (1980), the Court stated,

[W]e note that the Delaware statute regarding voir dire in capital cases follows very closely the rule laid down in *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) concerning when a juror should be challenged for cause on the basis of conscientious scruples against capital punishment. In *Witherspoon,* the defendant's sentence of death was overturned because all jurors who had expressed conscientious scruples against capital punishment were stricken from the panel. The resulting sentence was held constitutionally infirm as having been arrived at by a jury that was not impartial but rather heavily weighted in favor of the death sentence, in violation of the Sixth and Fourteenth Amendments. The Illinois statute in *Witherspoon* permitted this by allowing removal

of all scrupled jurors for cause, and the Court noted that by excluding them Illinois had kept out even those who despite their scruples would be able to decide the issue of guilt fairly based on the evidence presented. Thus, the *Witherspoon* standard that only those jurors who would be unable to render an impartial verdict because of their opposition to capital punishment could be excused for cause, was developed. The standard was reaffirmed recently in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Our similar statute was held constitutional in *Steigler v. State,* Del.Supr., 277 A.2d 662 (1971).

Notwithstanding the Delaware Supreme Court's decision in *Hooks v. State,* supra, the defendant contends that the exact issue here presented has not been ruled upon definitively in Delaware nor by the United States Supreme Court. In *Witherspoon v. Illinois,* supra, the Supreme Court stated,

> The data adduced by the petitioner, however, are *too tentative and fragmentary* to establish that jurors not opposed to the death penalty tend to favor the prosecution in the determination of guilt. We simply cannot conclude, either on the basis of the record now before us or as a matter of judicial notice, that the exclusion of jurors opposed to capital punishment results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction. In light of the *presently available information,* we are not prepared to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was. (Emphasis added).

Moreover, in footnote # 18 to the *Witherspoon* decision, the Court stated,

> 18. *Even so, a defendant convicted by such a jury in some future case might still attempt to establish that the jury was less than neutral with respect to guilt.* If he were to succeed in that

effort, the question would then arise whether the State's interest in submitting the penalty issue to a jury capable of imposing capital punishment may be vindicated at the expense of the defendant's interest in a completely fair determination of guilt or innocence— given the possibility of accomodating both interests by means of a bifurcated trial, using one jury to decide guilt and another to fix punishment. That problem is not presented here, however, and we intimate no view as to its proper resolution. (Emphasis added).

The defendant in the case at bar suggests that he is the defendant described in footnote No. 18 and that the evidence now available, sixteen years after *Witherspoon,* is no longer "tentative and fragmentary." He relies heavily upon the holdings in *Grigsby v. Mabry,* E.D.Ark., 569 F.Supp. 1273 (1983), and *Keeten v. Garrison,* W.D. N.C., 578 F.Supp. 1164 (1984), both of which decisions are predicated upon the results of a series of jury studies which have been conducted in recent years.

As a part of the proceedings in the case at bar, the Court permitted, and has held, an evidentiary hearing on the issue raised by defendant. At that hearing the Court heard extensive testimony, presented in support of defendant's thesis, from Dr. Valerie P. Hans, a professor at the University of Delaware, who has been deeply involved in the study of jury decision making for over ten years, has quite recently conducted jury studies herself and has read and analyzed the studies relied upon by the Courts in *Grigsby* and *Keeten.* Dr. Hans was qualified by this Court as an expert on the issues presented. At the close of Dr. Hans' testimony, the Court heard testimony, presented by the State, from Dr. Gerald Shure, a professor at U.C.L.A. with extensive credentials as a social scientist with primary expertise in the field of Methodology used in social studies. Dr. Shure was also qualified by this Court as an expert.

Dr. Hans presented an overview of the conviction-proneness studies recognized by the Courts in both *Hovey v. Superior Court of Alameda City,* Cal.Supr., 28 Cal.3d 1, 168 Cal.Rptr. 128, 616 P.2d 1301 (1980), and *Grigsby v. Mabry,* supra, as the leading research in the field. These included the work of Professor Hans Zeisel (1968), Professor George Jurow (1971) and Dr. Phoebe Ellsworth (1979).

The 1968 *Zeisel* study [1] is an examination of the voting behavior of persons who had actually participated in criminal felony trials in Chicago and Brooklyn. Professor Zeisel and his assistants contacted jurors, present in the juryroom at the end of the last day of their eligibility to serve, and asked if they would be willing to be interviewed for a study on jury behavior. Approximately two-thirds agreed to participate. The stimulus used was a group of actual felony trials in Chicago and Brooklyn. The subjects were asked: (1) whether they had scruples against the death penalty; (2) if they had sat on a jury that had actually deliberated in a criminal case; (3) if so, how they had voted on the first ballot; and (4) the vote of the entire panel of twelve on the first ballot. Professor Zeisel's data showed that in nine out of the eleven split-vote possibilities (11:1 for guilt to 1:11 for guilt), non-scrupled jurors voted to convict more often in cases of like evidentiary strength than scrupled jurors; and in ten out of eleven cases of like evidentiary strength, scrupled jurors voted to acquit more often than non-scrupled jurors. His work thus tended to demonstrate significant differences between the conviction behavior of scrupled and non-scrupled jurors. However, his study was conducted before the *Witherspoon* decision and did not focus on the narrower post-*Witherspoon* test for

exclusion. Moreover, the survey involved "volunteers" who numbered only two-thirds of the total number of jurors asked to participate. Finally, Zeisel's study was not limited to jurors in capital cases, the specific issue here.

The 1971 *Jurow* study [2] looked at the effect of death qualification upon guilt determination. Professor Jurow used a non-random sample of Sperry Rand employees, 99% of whom were white and 80% of whom were male. One-third of the 211 subjects had had prior jury service. The subjects filled out a questionnaire to determine attitudes toward the death penalty and to assess how the subject would consider the death penalty if serving on a jury. Professor Jurow then asked the subjects to vote guilty or not guilty in two cases presented by audio tapes. After the subjects had heard the tapes and voted upon the two cases, Professor Jurow compared their voting behavior in relation to their death penalty attitudes. In one of the two cases he found that the stronger the subject's views were in favor of the death penalty, the more likely that subject would vote to convict. He found the same relationship in the other case, but the differences in the latter were not statistically significant.

Dr. Phoebe Ellsworth has conducted two studies related to this issue, both of which were discussed by Dr. Hans.

The 1979 *Ellsworth Conviction-Proneness Study* [3] was a controlled examination of a group of 288 individuals, most of whom had responded to a newspaper published request for volunteers for a study of "how juries make decisions." The subjects' views on capital punishment were determined and the subjects were then divided into groups

1. H. Zeisel, Center for Studies in Criminal Justice, University of Chicago Law Law, *Some Data on Juror Attitudes Toward Capital Punishment,* Monograph, 1968.

2. G. Jurow, *New Data on The Effects of a "Death-Qualified" Jury on The Guilt Determination Process,* 84 Harv.Law Rev. 567 (1970).

3. P. Ellsworth, W. Thompson & C. Cowen, *Juror Attitudes and Conviction Proneness: The Relationship Between Attitudes Towards The Death Penalty and Predisposition to Convict,* 1979 (unpub.) [hereinafter "Ellsworth Conviction-Proneness Study].

and shown a two and one-half hour videotaped reenactment of an actual criminal trial. After the videotape had played each "juror" was asked to vote for one of four possible verdicts: guilty of first degree murder, guilty of second degree murder, guilty of manslaughter, or not guilty by reason by self-defense. The results, Ellsworth concluded, provided strong support that death-qualified jurors are more likely to convict than are jurors excludable under the *Witherspoon* criteria.

The 1979 *Ellsworth Attitude Survey*[4] involved 811 randomly selected persons. The subjects were selected using a process known as random digit dialing with interviews conducted by experienced professional interviewers. The survey asked several questions concerning the subjects' attitudes toward capital punishment. Ellsworth attempted to compare the *Witherspoon*-qualified "jurors" with those jurors who could be impartial as to guilt but who could never vote for the death penalty (those whom Ellsworth terms "guilt-phase includables"). The subjects were asked 13 attitudinal questions concerning such areas as the insanity defense, a defendant's refusal to testify, a juror's consideration of media coverage of the trial in making a decision, and defense counsel tactics at trial. Ellsworth combined the results of all 13 questions and concluded that the *Witherspoon*-qualified group was more prosecution-prone than the "guilt-phase includable" group, to a statistically significant degree.

Dr. Hans supplemented these studies with data which she gathered in New Castle County, Delaware in 1982 and 1983 concerning death penalty attitudes and their relationship to "clusters of attitudes" concerning the criminal justice system in general. Her random telephone polls replicated the results of several of the other studies tending to show that those who would abolish capital punishment were more likely to

believe that "the Court deals too harshly with criminals," less likely to believe that "too many obviously guilty persons escape punishment because of legal technicalities," and less likely to believe that "the insanity defense is a loophole that allows too many guilty people to go free."

Although Dr. Hans has a superior academic record and has spent several years studying jurors' general attitudes and behavior, the Court notes that her studies did not attempt to examine the group of jurors that would be excluded under the *Witherspoon* standards, or to compare that group to those who would be allowed to serve. Her study identifies those with general scruples concerning the death penalty, but does not identify *Witherspoon* excludables, "automatic death penalty group" ("ADPs"), i.e., those who would *always* vote for the death penalty given that option, nor guilt-phase excludables. Indeed, the study was not so directed. Thus, even though Dr. Hans' results tend to reflect a difference between those who are in favor of the death penalty and those who are opposed to it, there again is no clear applicability of those general results to the specific issue here.

Throughout the hearing and briefing of the issue presented here, the State has not seriously contended that there is no correlation between attitude toward the death penalty and conviction proneness. Thus, the State does not refute the actual findings of the various studies presented by the defendant. Rather, the thrust of the State's position has been to question the methodology of those studies, and the propriety of generalizing the results of those studies to reach the specific constitutional conclusions which defendant seeks.

Dr. Shure, testifying for the State, raised several questions concerning the validity and conclusiveness of the various studies discussed by Dr. Hans. According to Dr.

---

4. P. Ellsworth & R. Fitzgerald, *Due Process v. Crime Control: The Impact of Death Qualification of Jury Attitudes*, 1979 (prepub. draft) [hereinafter "Ellsworth Attitude Survey"].

Shure, all of the existing studies, including his own, exhibit various flaws and limitations. He pointed out that all the surveys prior to his own failed to ask more than one question concerning the death penalty qualification, and thus did not accurately reflect the actual *voir dire* process. Furthermore, except for the Zeisel study, all of the studies failed to use real jurors and actual trial situations. Dr. Shure pointed out that in none of the studies were "jurors" studied in circumstances comparable to the real life drama presented when venire persons are being carefully examined as possible jurors in a specific case about to be tried. It is Dr. Shure's conclusion, as a Methodologist, that absent a study growing out of a similar setting, it cannot be concluded with any degree of scientific certainty that the exclusion of jurors in capital cases, pursuant to the Delaware statute, would result in more conviction-prone juries than would result in non-capital cases.

Another point raised, and related to the significance of the survey findings, is the fact that none of the surveys identified and *examined* the ADPs. Although defendant strongly contended that the percentage of people who would fall into that category would be negligible, Dr. Shure's own research indicated that the percentage may be as high as 33 percent. While the Court questions the accuracy of that figure, as did Dr. Shure himself, it certainly indicates that the evidence is inconclusive as to the percentage, and, therefore, the impact of the ADPs. Dr. Shure contended that no study yet had accurately identified the size of this group and determined the conviction-proneness of the resulting jury with the ADPs removed.

The lack of reliable evidence (or at least the existence of contradictory and inconclusive evidence) on the effect of excluding ADPs from capital cases, because they could not impartially apply the law to the facts of the case, undercuts the assertion that these recent studies conclusively show that a pool of *Witherspoon*-qualified jurors is more conviction prone than a pool of eligible jurors in a non-capital trial in which the death penalty question does not even arise.

The Court in *Witherspoon* clearly placed the burden upon the defendant to establish that the exclusion of jurors who are so opposed to capital punishment that they could never vote for it results in an unrepresentative jury on the issue of guilt or substantially increases the risk of conviction.

 Although the defendant here has merely moved for an order granting separate juries on the guilt and penalty phases, he has, in effect, argued that 11 *Del.C.* § 3301 is unconstitutional and should not be applied as it has been in the past. In evaluating the testimony and evidence presented on the issue before this Court, the Court recognizes that the current statutory procedure for jury selection in capital cases has withstood constitutional tests in the past, although not specifically addressing the issue here presented. Furthermore, the Court must, and should, keep in mind the principal of statutory construction which has been followed by courts from time immemorial: that a statute will be presumed to be constitutionally firm unless the evidence is clearly to the contrary. Thus, a party asserting the unconstitutionality of a statute must show that the question of the constitutionality of the statute is fairly debatable. *Wilmington Med. Ctr., Inc. v. Bradford*, Del.Supr., 382 A.2d 1338 (1978). Moreover, once a party has established that the constitutionality of the statute is fairly debatable, he must, in order to overcome the presumption of constitutionality, establish *clearly* and *convincingly* the lack of constitutionality of the statute. *Justice v. Gatchell*, Del.Supr., 325 A.2d 97 (1974).

In the case at bar, the Court is persuaded, particularly by Dr. Shure's testimony, that despite the many studies which tend to

indicate that defendant's contention is correct, nevertheless those studies lack, in large dimension, the kind of certainty that the scientific community would ordinarily rely upon. There is no doubt that all of the studies relied upon by the defendant point in the direction he wishes to go. Indeed, assuming that increasingly sophisticated studies continue to be done, and continue to support the contention raised by Mr. Witherspoon sixteen years ago, it may be only a matter of time before a defendant does establish that a *Witherspoon* -qualified jury is less than neutral with respect to guilt. Until that time, however, the Court has available for its consideration only a number of studies, some of them very sophisticated and well done, but none of which address the very specific question at bar with results which are at all conclusive on that specific issue.

■ Casting aside any personal predilections which might exist, it is this Court's judgment that the standards laid down in *Witherspoon,* and which are followed closely in 11 *Del.C.* § 3301, should and must be followed unless and until such time as evidence is presented upon which the Court can rely with reasonable conviction and certainty. The evidence here presented, although impressive, does not rise to that level.

■ As a consequence, the Court concludes that the defendant has not sustained his burden of establishing that a *Witherspoon* -qualified jury is less than neutral in determining the issue of guilt. Defendant's motion for separate juries on the issues of guilt and penalty must, therefore, be denied.

IT IS SO ORDERED.