**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

| | |
|---|---|
| NEWARK PROPERTY ASSOCIATION; DELAWARE APARTMENT ASSOCIATION; FIRST STATE MANUFACTURED HOUSING ASSOCIATION; DELAWARE HOTEL & LODGING ASSOCIATION;<br><br>Plaintiffs,<br><br>v.<br><br>STATE OF DELAWARE; MATT MEYER, Governor of the State of Delaware; MARCUS HENRY, New Castle County Executive, DAVID DEL GRANDE, Acting Chief Financial Officer of New Castle County; APPOQUINIMINK SCHOOL DISTRICT BOARD OF EDUCATION; BRANDYWINE SCHOOL DISTRICT BOARD OF EDUCATION; CHRISTINA SCHOOL DISTRICT BOARD OF EDUCATION; COLONIAL SCHOOL DISTRICT BOARD OF EDUCATION; NEW CASTLE COUNTY VOCATIONAL TECHNICAL SCHOOL DISTRICT BOARD OF EDUCATION; RED CLAY CONSOLIDATED SCHOOL DISTRICT BOARD OF EDUCATION;<br><br>Defendants. | C.A. No. 2025-1031-LWW |

**OPINION**

Date Submitted: October 20, 2025
Date Decided: October 30, 2025

Ashley R. Altschuler, Kevin M. Regan, Anna F. Martin, MCDERMOTT WILL & SCHULTE LLP, Wilmington, Delaware; Paul W. Hughes, Mary H. Schnoor, Alex C. Boota, MCDERMOTT WILL & SCHULTE LLP, Washington, DC; *Attorneys for Plaintiffs*

Max B. Walton, Michael J. Hoffman, Matthew F. Boyer, Grace E. Best, CONNOLLY GALLAGHER LLP, Newark, Delaware; *Attorneys for Defendants State of Delaware and Governor Matt Meyer*

Michael P. Stafford, Mary F. Dugan, Michael A. Laukaitis, II, Alpa V. Bhatia, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; *Attorneys for Defendants Appoquinimink School District Board of Education, Brandywine School District Board of Education, Christina School District Board of Education, Colonial School District Board of Education, New Castle County Vocational Technical School District Board of Education, and Red Clay Consolidated School District Board of Education*

Nicholas J. Brannick, BALLARD SPAHR LLP, Wilmington, Delaware; *Attorney for Defendants Marcus Henry and David Del Grande*

**WILL, Vice Chancellor**

This is a post-trial decision on a challenge to a temporary tax law. It is not about the fairness of the recent county-wide property reassessment. That reassessment, which led to property tax increases for many New Castle County homeowners, was the result of a separate lawsuit before a different judge. Instead, this case is about the Delaware General Assembly's response to that court-ordered reassessment.

Amid public outcry over new tax bills, the legislature passed House Bill 242 (HB242). HB242 allows New Castle County school districts to create a temporary split-rate system, charging a higher tax rate on non-residential properties (like apartment buildings and hotels) and a lower rate on residential properties. The law was designed to shift a portion of the tax burden off homeowners and onto those non-residential properties. The change is for the 2025-2026 tax year only.

The plaintiffs—associations representing non-residential property owners—have sued to block HB242. They argue that the split-rate system is unconstitutional and illegal on six grounds. In resolving their claims, it is not my job to decide whether HB242 is fair or wise policy. The question before me is a legal one: does HB242, or the way the County and school boards are implementing it, violate the United States Constitution, the Delaware Constitution, or state statutes?

For the reasons explained below, I conclude that it does not. Judgment is entered for the defendants on all counts.

1

## I.      FACTUAL BACKGROUND

The following facts were stipulated to by the parties or proven by a preponderance of the evidence.[1]

### A.      The *Public Schools* Decision

For nearly forty years, New Castle County taxed properties based on its last general reassessment in 1983.[2]   These assessments were static despite market fluctuations and divergent property appreciation rates.

That long-standing practice was successfully challenged in the Court of Chancery in 2020.  In *In re Delaware Public Schools Litigation*, Vice Chancellor Laster held that using decades-old property valuations for tax assessments violated Delaware's Uniformity Clause and True Value Statute, which require property assessments to reflect fair market value.[3]   The court found that the outdated

---

[1] Joint Statement of Undisputed Facts (Dkt. 50) ("Stipulated Facts").  Exhibits submitted by the plaintiffs are cited as "Pls.' Ex. __."  Exhibits submitted by the defendants are cited as "Defs.' Ex. __."  In addition to the exhibits, the parties submitted various sworn declarations and affidavits.

[2] Stipulated Facts ¶ 16.  The purpose of reassessment is to make a property's assessed value more closely align with its present market value.  The reassessed value is then used to calculate property taxes.  Pls.' Ex. 9 (letter to Denzil J. Hardman from Assessor Michael G. McFarlane, with attachments, dated Apr. 24, 2025 ("Tyler Report")).

[3] 239 A.3d 451, 540 (Del. Ch. 2020); *see* Del. Const. art. VIII, § 1; 9 *Del. C.* § 8306(a); *see also New Castle Cnty. Dep't of Fin. v. Tchrs. Ins. & Annuity Ass'n*, 669 A.2d 100, 102 (Del. 1995); *supra* notes 63, 199 and accompanying text.

2

assessments produced disparate effective tax rates and a "profound lack of uniformity" even though taxpayers were charged the same uniform nominal rate.[4]

As a result of that ruling, New Castle County conducted its first general reassessment in decades.[5] It aimed to comply with the *Public Schools* decision by valuing properties at current fair market value using a July 1, 2024 base date.[6]

## B. The Reassessment

After a public bidding process, New Castle County retained Tyler Technologies, Inc. to conduct the reassessment.[7] Tyler relied on principles of mass appraisal—using collective data, analytical methods, and statistical modeling—to

---

[4] *Pub. Schs.*, 239 A.3d at 486. A hypothetical may explain the distinction between the nominal rate and the effective rate addressed in *Public Schools*. Imagine two neighbors in the same school district who were both paying a 1% "nominal rate" on their 1983 assessed values. Under the prior system, they were taxed non-uniformly. One neighbor, whose home was last valued in 1983 at $100,000 and is currently worth $250,000, paid $1,000 in taxes. This means their effective tax rate (the tax paid divided by the home's current value) was 0.4%. The other neighbor, whose home was also valued in 1983 at $100,000 but is currently worth $500,000, also paid $1,000 in taxes. This means their effective tax rate was only 0.2%. Though both neighbors paid the same nominal rate, one neighbor was paying an effective tax rate twice as high as the other. The reassessment was ordered to fix this disparity by valuing both homes at their true, current market value.

[5] Stipulated Facts ¶ 16.

[6] *Id.* ¶¶ 17, 20.

[7] *Id.* ¶ 18.

3

assess property values.[8]  Consistent with the County's directive, Tyler valued the subject real property as of July 1, 2024.[9]

In mid-November 2024, Tyler mailed notices to all taxpayers with the tentative assessed values for their properties.[10]  Property owners could challenge their assessments by speaking at an informal value review hearing before the property tax roll was certified and by filing a formal appeal to the Board of Assessment Review.[11]  The deadline for filing a formal appeal was March 31, 2025.[12]

The newly assessed property values were effective as of July 1, 2025 for the 2026 fiscal year.[13]  After the reassessment, school boards across the County calculated revised property tax rates and delivered new tax warrants to the New Castle County Office of Finance.[14]  The County then mailed school district and

---

[8] *Id.* ¶ 19.  These principles have been codified by the International Association of Assessing Officers' (IAAO) Standard on Mass Appraisal of Real Property.  *Id.*

[9] *Id.* ¶ 20.

[10] *Id.* ¶ 22.

[11] *Id.* ¶¶ 23-24.

[12] *Id.* ¶ 24.

[13] *Id.* ¶ 25.

[14] *Id.* ¶¶ 26, 28.

property tax bills to taxpayers during the week of July 21.[15]  An initial September 30, 2025 payment deadline was later extended to November 30.[16]

### C.    The Reassessment's Effects

The reassessment was intended to correct a decades-long imbalance. Residential properties, which had appreciated faster than other real estate, were under-assessed.[17]  Correcting this disparity required a larger upward adjustment to residential property values, which in turn increased residential property owners' total share of the County's overall tax base.  The residential share of the New Castle County tax base increased from 65.87% to 75.52%, and the non-residential share correspondingly decreased from 34.13% to 24.48%.[18]  This shift resulted in substantial tax increases for many single-family homeowners.

Although many commercial properties saw their tax burden decrease, the effect was uneven across non-residential properties more broadly.  Multi-family

---

[15] *Id.* ¶ 29.  The bills covered tax obligations from July 1, 2025 through June 30, 2026, reflecting the new assessed values and corresponding tax rates.  *Id.* ¶¶ 30-31.

[16] *Id.* ¶¶ 32-33, 53.

[17] Pls.' Ex. 1 (Expert Report of Norman Miller, Ph.D., dated Oct. 7, 2025) ("Miller Report") ¶¶ 19-20.

[18] *See* Decl. of David Del Grande (Dkt. 55) ¶ 5.

apartment buildings in particular experienced dramatic increases in their assessed values and tax liabilities due to their strong market performance.[19]

### D. HB242

On August 12, 2025, facing public outcry over increased property taxes from the reassessment, the Delaware General Assembly convened a special one-day session.[20] The legislature bypassed ordinary committee procedures and passed House Bill 242 (HB242), titled "An Act Relating to Local School Taxes in the 2025-2026 School Year."[21] HB242 authorized school districts to create a dual-rate tax system for the 2025-2026 tax year only.

The legislation was designed to temporarily shift a portion of the tax burden from residential to non-residential property owners by allowing school boards to establish different (and heightened) tax rates for non-residential properties relative to residential ones.[22] Under New Castle County's classification system, "non-

---

[19] Miller Report ¶¶ 45-47; *see also id.* ¶¶ 23-25 (explaining that, under the new tax bills, the non-residential rates are "between 62% and 99% higher than the residential rates").

[20] Stipulated Facts ¶ 33.

[21] Del. H.B. 242, 153d Gen. Assem. (2025) ("An Act Relating to Local School Taxes in the 2025-2026 Tax Year") (HB242); Stipulated Facts ¶ 34; *supra* note 40 (quoting HB242 in full). HB242 passed in the House by a 30-8 vote, passed in the Senate by a vote of 14 yes, four abstentions, and three absent, and was signed into law by Governor Meyer on August 12. *See* Transmittal Aff. of Grace Best (Dkt. 59) Ex. A.

[22] Stipulated Facts ¶ 35; *see also id.* ¶¶ 106-19 (describing New Castle County's implementation process).

6

residential" property includes apartment buildings with five or more units, hotels, motels, and the land underlying manufactured home communities.[23] "Residential" property is that "classified as either Residential or Farmland" in the County's parcel records.[24] School districts were required to deliver new tax warrants within ten business days, and the County was authorized to issue revised tax bills with the changes.[25]

Acting under HB242, every New Castle County school district promptly established a split-rate system for the 2025-2026 tax year that applied different tax rates for residential and non-residential properties.[26] They increased the tax rates for non-residential properties—by percentages ranging from 35% to 80%—while lowering tax rates for residential properties.[27] As a result, tax rates for non-residential properties became higher than residential rates for homes. The gap,

---

[23] *Id.* ¶¶ 56, 117-18.

[24] *Id.* ¶ 107 (quoting Substitute No. 1 to New Castle County Ordinance No. 25-048).

[25] *Id.* ¶¶ 36-37.

[26] *Id.* ¶¶ 38-51.

[27] *See id.* ¶¶ 38-49 (detailing the specific rate changes for each school district). For example, the Brandywine School District Board of Education raised the tax rate for non-residential properties from $0.6661 per hundred dollars of assessed value to $1.0382. *Id.* ¶ 41. At the same time, it lowered the tax rate for residential properties from $0.6661 per hundred dollars to $0.5609 per hundred dollars. *Id.* ¶ 40.

while meaningful, did not exceed HB242's limit on the non-residential tax rate, which could be no more than double the residential rate.[28]

## E. This Litigation

On September 12, 2025, four nonprofit organizations representing non-residential New Castle County property owners filed this lawsuit.[29] The associations are suing the State of Delaware, Governor Matt Meyer, two New Castle County officials, and six New Castle County school boards (the "School Boards").[30] The plaintiffs claim that HB242 is invalid because it is "regressive" and unlawfully shifts the tax burden from homeowners onto lower-income renters and residents of manufactured homes.[31] The plaintiffs believe that implementing HB242 will cause

---

[28] *Id.* ¶ 52.

[29] Verified Compl. for Decl. and Inj. Relief (Dkt. 1). The plaintiffs are Newark Property Association, Delaware Apartment Association, First State Manufactured Housing Association, and Delaware Hotel & Lodging Association. Stipulated Facts ¶¶ 2-5.

[30] The New Castle County officials named as defendants are Marcus Henry, the County Executive, and David Del Grande, the County's Acting Chief Financial Officer. Stipulated Facts ¶¶ 6-9. The School Board defendants are: Appoquinimink School District Board of Education, Brandywine School District Board of Education, Christina School District Board of Education, Colonial School District Board of Education, New Castle County Vocational Technical School District Board of Education, and Red Clay Consolidated School District Board of Education. *Id.* ¶¶ 10-15.

[31] Verified Am. and Suppl. Compl. (Dkt. 73) ("Am. Compl.") ¶ 1.

"irreparable harm," leaving them unable to pay their property taxes and risking foreclosure and business disruption.[32]

The plaintiffs moved to expedite this case and for a temporary restraining order enjoining the implementation of HB242.[33] The defendants opposed the motion, framing HB242 as a legitimate policy response to the reassessment's unforeseen shift in property taxes from non-residential to residential properties.[34] During a hearing on the motions, I committed to resolve the case by October 30 so that property tax bills could be timely issued. The defendants agreed not to implement HB242 (or issue new tax bills) in the meantime.[35]

Expedited discovery ensued. In a written discovery response, the defendants acknowledged that certain properties had been misclassified as residential or non-residential.[36] They explained that the County had "begun a process of manually verifying and correcting" the errors, which would result in some reclassification.[37]

---

[32] *Id.* ¶¶ 11-14.

[33] Pls.' Mot. for TRO (Dkt. 2).

[34] Defs.' Answering Br. in Opp'n. to Pls.' Mot. for TRO (Dkt. 27). The parties stipulated that the defendants were "deemed to have complied with their obligation to respond to their Complaint" by filing their answering brief in opposition to the plaintiffs' motion for a temporary restraining order. *See* Stipulation and Initial Scheduling Order (Dkt. 32).

[35] *See* Tr. of Hr'g on Pls.' Mot. for TRO (Dkt. 37); Stipulation and Initial Scheduling Order (Dkt. 32); *see also* Stipulation and Order Governing Case Schedule (Dkt. 34).

[36] Mot. for Leave to File Am. and Suppl. Verified Compl. (Dkt. 40) ¶¶ 19, 32.

[37] *Id.* ¶¶ 19, 20, 32 (quoting Defs.' Resp. to Pls.' Interrog. 1 ¶ 23).

On October 14, the plaintiffs filed an Amended and Supplemental Complaint that added related claims.[38]

The parties each filed opening and answering pre-trial briefs.[39] They submitted a largely stipulated record, supplemented by declarations and expert reports. A trial on a paper record was held on October 20, at which point the matter was submitted for decision.

## II. LEGAL ANALYSIS

The plaintiffs take issue with the enactment and implementation of HB242, which provides a temporary, one-year split-rate tax system for New Castle County school districts.[40] They challenge HB242 on six grounds:

---

[38] *See supra* note 31. The plaintiffs also sought additional discovery on the reclassification. *See* Mot. to Am. Case Scheduling Order to Permit Limited Additional Disc. (Dkt. 41). I granted that motion in part. Order Granting Motion in Part (Dkt. 72).

[39] *See* Pls.' Opening Br. (Dkt. 51); Defs.' Opening Br. for Final Hr'g on the Merits (Dkt. 53) ("Defs.' Opening Br."); Pls.' Answering Br. (Dkt. 89); Defs.' Answering Br. for Final Hr'g on the Merits (Dkt. 91) ("Defs.' Answering Br.").

[40] The full text of HB242 provides:

Section 1. Notwithstanding any provision of law to the contrary, on enactment of this Act:

(1) The school board of a school district located entirely in New Castle County may, for the 2025-2026 school tax year, reset the local school tax rate using a residential and a non-residential tax rate. The non-residential tax rate must be at least equal to the residential tax rate and may not be more than 2 times the residential tax rate. The total amount of revenue projected to be collected through use of the residential and non-residential tax rates may not exceed the total amount of revenue the district was projected to collect under its original 2025-2026 tax warrant.

10

- Count I: Uniformity Clause. The plaintiffs claim that HB242 violates the Uniformity Clause of the Delaware Constitution.[41]

- Count II: Prohibition on Retroactive Taxes. The plaintiffs claim that HB242 violates Delaware's constitutional prohibition on retroactive personal income taxes.[42]

- Count III: Improper Tax Rate Procedure. The plaintiffs claim that the School Boards violated Delaware statutes by implementing new tax rates without a voter referendum.[43]

---

(2) New tax rates approved by a school district under this Act must be reported to the County and delivered with a new warrant not later than 10 business days from the effective date of this Act.

(3) Upon receipt of a new warrant under paragraph (2) of this Act, New Castle County shall supplement any tax bill already issued to taxpayers in that district for the 2025-2026 tax year and adjust initial billing using the new local school tax rates set by the district. New Castle County shall extend the deadline for payment of property tax bills for the 2025-2026 tax year that are supplemented or adjusted under this Act to November 30, 2025.

(4) If a taxpayer submits payment prior to an adjustment in billing under paragraph (3) of this Act, and the taxpayer's school tax bill is adjusted downward, New Castle County shall credit the overpayment against future school tax liability, unless a taxpayer submits a written request for refund of overpayment to New Castle County, in which case New Castle County shall issue a refund.

(5) If a school district resets the school district's tax rates in accordance with this Act and a cash flow shortfall of local school funds occurs due to the extension of the deadline for tax payments for the 2025-2026 school tax year, the school district may request, and the State may advance, monies from State Division I funds.

[41] Am Compl. ¶¶ 180-88.

[42] *Id.* ¶¶ 189-98.

[43] *Id.* ¶¶ 199-207.

11

- Count IV: Violation of Fair Market Value Assessment. The plaintiffs claim that the School Boards violated a statutory requirement that property be assessed at its fair market value.[44]

- Count V: Violation of HB242's Own Terms. The plaintiffs claim that the defendants violated HB242 by projecting to collect more revenue than permitted under the original 2025-2026 tax warrants, and by failing to report the new rates and deliver warrants within the required ten business day period.[45]

- Count VI: Due Process Violation. The plaintiffs claim that the defendants' "post-hoc reclassifications" of properties violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution.[46]

As relief, the plaintiffs seek declaratory judgments that HB242 and its implementation are unlawful, and an injunction barring the defendants from issuing new split-rate tax bills or imposing property reclassifications.[47]

The claims fall into two overarching categories: (1) constitutional claims, and (2) statutory or ultra vires claims.[48] The first set of claims includes Counts I, II, and VI, in which the plaintiffs argue that HB242 is invalid under the Delaware and United States Constitutions. In the second set, which includes Counts III, IV, and

---

[44] *Id.* ¶¶ 208-18.

[45] *Id.* ¶¶ 219-27.

[46] *Id.* ¶¶ 228-37.

[47] *Id.* at 50-51.

[48] Ultra vires means an act or a decision made by a person, a government agency, or an entity that is outside the scope of the legal authority or power granted to them. *See Ultra Vires*, Black's Law Dictionary (12th ed. 2024).

12

V, they argue that the defendants violated the plain terms of Delaware statutes they were charged with upholding. I consider each category in turn and conclude that none of the claims have merit.

## A. The Constitutional Claims (Counts I, II, and VI)

The plaintiffs' constitutional claims present both facial and as-applied challenges to HB242. For the facial challenges, they bear the heavy burden of proving that the challenged statute "cannot be valid under any set of circumstances."[49] "[I]f a law can be applied in a way consistent with [c]onstitutional strictures, it will be upheld."[50]

The standard is different for the as-applied challenges. The plaintiffs must demonstrate that HB242, as applied to them, violates a constitutional right. The focus is on the law's effect on the plaintiffs, not its general operation.[51] But the

---

[49] *Republican State Comm. of Del. v. Dep't of Elections*, 250 A.3d 911, 916 (Del. Ch. 2020) (quoting *Sierra v. Dep't of Servs. for Child., Youth & Their Fams.*, 238 A.3d 142, 156 (Del. 2020)).

[50] *League of Women Voters of Del., Inc. v. Del. Dep't of Elections*, 250 A.3d 922, 937 (Del. Ch. 2020) (commenting that a facial challenge to the constitutionality of legislation "invokes broad judicial deference").

[51] *See id.* ("An at-issue challenge . . . is based on exigencies; it asks the [c]ourt to withhold enforcement of a statute on the ground that existing circumstances will render its enforcement against the plaintiff unconstitutional. This can be true regardless of whether the law in question is facially constitutional."); *Del. Bd. of Med. Licensure & Discipline v. Grossinger*, 224 A.3d 939, 956 (Del. 2020).

burden is still a heavy one, requiring the plaintiffs to show the statute's application to them lacks any reasonable or lawful basis.[52]

Enactments of the General Assembly are presumed to be constitutional—a presumption that is rebuttable by "clear and convincing evidence."[53] The court must afford "great weight" to the General Assembly's articulation of public policy and give deference to legislative judgment in matters that are "fairly debatable."[54] It is not my role to "judge the wisdom, fairness, or logic of legislative choices."[55] I must, instead, apply a form of rational basis review where the "legislation enjoys a presumption of validity," and the plaintiffs must "negate every conceivable justification for the classification" to prevail.[56]

Settled principles guide my analysis of constitutional claims, which begins with the text.[57] "When a constitutional provision is unambiguous," Delaware courts

---

[52] *See* 16 *C.J.S. Constitutional Law* § 243, Westlaw (database updated June 2025).

[53] *Republican State Comm.*, 250 A.3d at 916 (quoting *Sierra*, 238 A.3d at 155-56).

[54] *Higgin v. Albence*, 2022 WL 4239590, at *15 (Del. Ch. Sept. 14, 2022), *aff'd in part, rev'd in part on other grounds*, 295 A.3d 1065 (Del. 2022); *Helman v. State*, 784 A.2d 1058, 1068 (Del. 2001).

[55] *Salem Church (Del.) Assocs. v. New Castle Cnty.*, 2006 WL 2873745, at *15 (Del. Ch. Oct. 6, 2006) (quoting *F.C.C. v. Beach Comms., Inc.*, 508 U.S. 307, 313 (1993)).

[56] *Port Penn Hunting Lodge Ass'n v. Meyer*, 2019 WL 2077600, at *6 (Del. Ch. May 9, 2019) (citation omitted), *aff'd*, 222 A.3d 1044 (Del. 2019).

[57] *In re Request of Governor for Advisory Op.*, 950 A.2d 651, 653 (Del. 2008) (explaining that a constitutional analysis "begins with that provision's language itself").

"rely on its plain language."[58]  "In that circumstance, the role of the judiciary is limited to giving that language its literal effect."[59]

### 1. The Uniformity Clause (Count I)

The plaintiffs first argue that HB242—on its face and as applied to them—violates Article VIII, Section 1 of the Delaware Constitution, known as the Uniformity Clause.[60]  For the facial challenge,[61] they assert that taxation of residential and non-residential properties at vastly different rates contravenes the Uniformity Clause.  For the as-applied challenge,[62] they contend that HB242 violates the Uniformity Clause as to them and as implemented by the defendants.  I address first the facial challenge, then the as-applied challenge, and reject both.

### a. The Facial Challenge

The Uniformity Clause states: "All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, except as

---

[58] *Op. of the Justs.*, 274 A.3d 269, 272 (Del. 2022) (citing *Capriglione v. State ex rel. Jennings*, 279 A.3d 803, 806 (Del. 2021)).

[59] *Korn v. New Castle Cnty.*, 2005 WL 2266590, at *6 (Del. Ch. Sept. 13, 2005); *see also U.S. v. Sprague*, 282 U.S. 716, 731 (1931) (stating that "[t]he Constitution was written to be understood by the voters; its words and phrases were used in their normal and ordinary as distinguished from technical meaning").

[60] Del. Const. art. VIII, § 1.

[61] *See supra* notes 49-50 and accompanying text (explaining that a facial challenger asserts that a law is unconstitutional in all its applications).

[62] *See supra* notes 51-52 and accompanying text (explaining the standard for an as-applied challenge).

15

otherwise permitted herein."[63]   The clause ensures that taxpayers within a certain class of subjects are not treated differently.[64]  It "should be construed in the light of the fundamental principle . . . it embodies," which requires a "uniform and equal distribution of the tax burden among the taxpayers upon whom the tax is imposed."[65] Put simply, "[u]niformity of taxation means equality of tax burden."[66]

The plaintiffs' focus is on the phrase "except as otherwise permitted herein" at the end of the Uniformity Clause.[67]  The phrase was added in a 1977 amendment, along with specific permissions for agricultural land valuation and local exemptions.[68]  In the plaintiffs' view, the text sets categorical and narrow grounds under which non-uniform real property taxation is constitutional, implying that all other sub-classifications of real property for differential tax rates are prohibited.[69]

---

[63] Del. Const. art. VIII, § 1.

[64] *See Brennan v. Black*, 104 A.2d 777, 784 (Del. 1954) (stating that the purpose of the provision is to maintain uniformity within "the same class of subjects within the territorial limits of the authority levying the tax").

[65] *In re Zoller's Est.*, 171 A.2d 375, 379-80 (Del. 1961).

[66] *Id.* at 380 (citation omitted).

[67] *See* Pls.' Opening Br. 40.

[68] Defs.' Ex. L (1 Wade J. Newhouse, *Constitutional Uniformity and Equality in State Taxation* (2d Ed. 1984)) 173.

[69] Pls.' Answering Br. 32-33 (citing the doctrine of *expression unius est exclusion alterius*). This doctrine is translated as "the expression of one thing is the exclusion of another."  It suggests that when a list exists, the exclusion of a certain item is deliberate.  *See Brown v. State*, 36 A.3d 321, 325 (Del. 2012); *see also Leatherbury v. Greenspun*, 939 A.2d 1284, 1291 (Del. 2007) ("[I]t is well established that a court may not engraft upon a statute language which has clearly been excluded therefrom." (citation omitted)).

They assert that since none of these exceptions authorizes the residential/non-residential split adopted by HB242, the statute violates the Uniformity Clause as amended.

The plaintiffs' reading, however, overlooks that the Uniformity Clause demands tax uniformity "*upon the same class of subjects.*"[70] This language does not forbid classification; it presumes it. The prohibition is on discrimination within a given class.[71] The central question, then, is whether the classification chosen by the legislature is permissible under the Uniformity Clause.

### i. *Subject Classes Generally*

The crux of the plaintiffs' facial challenge is that the sole constitutionally permissible "class of subjects" is all real property within the taxing district.[72] Under this view, any legislative attempt to sub-classify real property—such as the residential and non-residential distinction in HB242—violates the Uniformity Clause, regardless of its reasonableness. I disagree.

---

[70] Del. Const. art. VIII, § 1 (emphasis added); *see also* Defs.' Ex. Y (1 Wade J. Newhouse, *Constitutional Uniformity and Equality in State Taxation* (2d Ed. 1984)) 1899 (stating that Delaware is among the states with the "most permissive effective uniformity limitation," such that "there is no requirement of universality and property may be classified for application of different effect rates").

[71] *See, e.g.*, *Brennan*, 104 A.2d at 797.

[72] Pls.' Opening Br. 32-34.

17

Although the Uniformity Clause requires the same tax rate for all taxpayers within a category, it does not bar the legislature from drawing rational lines to establish different taxpayer classes.  Delaware courts have long recognized that "under the language of [the Uniformity Clause] . . . the legislature has the right to classify property for the purpose of taxation."[73]  As Justice Holland's eponymous book on the Delaware Constitution observed, classifications based on "inherent differences in the nature, character, or use of real property within the same territorial limits may result in different tax classifications."[74]

The test of constitutionality under the Uniformity Clause is not whether the legislature has classified real property, but "the reasonableness of the classification."[75]  "[T]here is . . . no fixed standard by which the reasonableness of [a] classification can be measured."[76]  "[E]ach case must stand upon its own

---

[73] *Phila., B. & W. R. Co. v. Mayor & Council of Wilm.*, 57 A.2d 759, 765-66 (Del. Ch. 1948) (citing 1 *Cooley on Taxation* § 292, which states that, if a constitutional provision "provides that taxes shall be uniform upon the 'same class' of subjects, then, of course, different rates may be fixed for different classes, provided the classification is not purely arbitrary").

[74] Randy J. Holland, *The Delaware State Constitution* 233 (2d ed. 2017); *see also Phila., B. & W. R.*, 57 A.2d at 765 (observing that classifications based on "inherent differences" in the nature, character, or use of real property are "sufficient" to draw classifications between property types and endorsing the idea that lands used for agricultural purposes can be taxed at a lower rate than other property within a municipality).

[75] *Wilm. Med. Ctr., Inc. v. Bradford*, 382 A.2d 1338, 1344 (Del. 1978).

[76] *Conard v. State*, 16 A.2d 121, 125 (Del. Super. 1940).

particular facts."[77]  "[A] classification will be held valid if the court is able to see that the [l]egislature could regard it as reasonable and proper without doing violence to common sense."[78]  The classification set by the legislature will not be disturbed "unless the statute is clearly arbitrary."[79]

ii.  *The Classes in HB242*

As a matter of policy, I presume that HB242 is constitutional.[80]  "The existence of facts to support the classification of the legislature must be assumed if any set of facts can reasonably be conceived which will sustain such classification."[81]  In passing HB242, the legislature chose to "reset the local school tax rate using a residential and a non-residential tax rate."[82]  Nothing in the record suggests that the General Assembly's differentiation of residential and non-residential classes was unreasonable or arbitrary.

---

[77] *Id.*

[78] *Id.* (stating that a classification is not arbitrary when it is "based on reason"); *see also Betts v. Zeller*, 263 A.2d 290, 293 (Del. 1970) (citing *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522 (1959) and *Madden v. Commonwealth of Ky.*, 309 U.S. 83, 87-88 (1940), where the United States Supreme Court described the "broad discretion as to classification possessed by a legislature in the field of taxation").

[79] *Aetna Cas. & Sur. Co. v. Smith*, 131 A.2d 168, 177-78 (Del. 1957).

[80] *See id.*; *Helman*, 784 A.2d at 1068 ("Courts are not super-legislatures and it is not a proper judicial function to decide what is or is not wise legislative policy.").

[81] *Aetna Cas.*, 131 A.2d at 177.

[82] HB242 § 1(1).

HB242 was passed in response to the 2025 reassessment, which shifted an unanticipated tax burden onto residential properties.[83] Legislators were concerned about the hardship placed on homeowners and viewed companies as better positioned to absorb a one-time higher tax bill.[84] These equitable concerns motivated the legislature to enact HB242 to mitigate the initial hardship on homeowners.[85] These are rational reasons to distinguish between residential and non-residential properties.[86]

---

[83] Pls.' Ex. 69 (Excerpt of August 21, 2025 Christina School District Board of Education Special Meeting) 3-4; *supra* note 18 (discussing the changes in tax burden); Aff. of Rep. Kimberly Williams ¶ 6.

[84] *See* Defs.' Ex. J (Transcript, August 12, 2025 Special Legislative Session) 171 (remarking "when you have Amazon paying $3.5 million in taxes and it's being reduced to $1.1 million, there is a problem"); *id.* at 172 (discussing the $39 shift in tax burden from commercial to residential properties between 2024 and 2025); Lockman Aff. ¶¶ 10-11 (stating that "[b]usiness entities owning commercial property are better equipped to bear the costs associated with the tax increase"). It is left to the non-residential property owners whether they pass these costs onto renters or customers.

[85] Pls.' Ex. 69 at 18-19. A member of the Christina School District Board remarked: "I'd like to stress that this power is not permanent. So, the state legislature gave us this power for this year. We know that this is not the ultimate solution that we're all looking for, for school funding, and we're going to need to continue to work, to continue to fight to get a much better solution." *Id.*

[86] HB242 also includes a safeguard that caps the non-residential rate at two times the residential rate. HB242 § 1(1). This limiting principle helps ensure that the classification does not become arbitrary or unreasonable.

### iii. *The* Public Schools *Decision*

The plaintiffs insist that the *Public Schools* decision, which catalyzed the reassessment, compels the resolution of Count I in their favor.[87] They read the decision as holding that a Uniformity Clause violation occurs whenever "effective tax rate[s]" differ across property categories, citing the court's discussion of non-uniformity "between commercial and residential property."[88] The plaintiffs argue that because HB242 explicitly creates different nominal tax rates leading to different effective tax rates for residential and non-residential properties, it replicates the constitutional violation identified in *Public Schools*.[89]

The plaintiffs wrongly conflate the cause of the constitutional violation in *Public Schools* with the legislation at issue here. *Public Schools* addressed the unconstitutionality of using stale property assessments (valuations) that failed to uniformly reflect fair market value.[90] The resulting disparity in effective tax rates, despite a uniform nominal rate, was the symptom of that underlying assessment

---

[87] *See* Pls.' Opening Br. 44-50; Pls.' Answering Br. 37-40; *see generally Pub. Schs.*, 239 A.3d 451.

[88] Pls.' Opening Br. 44, 46 (quoting *Pub. Schs.*, 239 A.3d at 487, 496-97); *see* Tr. of Oct. 20, 2025 Trial (Dkt. 110) ("Trial Tr.") 36-37; *see also* Pls.' Answering Br. 2, 37.

[89] *See* Pls.' Opening Br. 48-50.

[90] *Pub. Schs.*, 239 A.3d at 464, 485-86.

21

problem.[91]  The constitutional infirmity was the flawed and non-uniform assessment methodology itself.[92]  The remedy ordered in *Public Schools*—a general reassessment—was aimed at fixing the disparate valuations by bringing them into line with current fair market value across properties.

This case concerns a different issue: whether the General Assembly, operating on the foundation of the reassessment ordered by *Public Schools*, can constitutionally classify real property and apply different nominal tax rates to those classes.[93]  *Public Schools*, which focused on achieving uniformity through accurate assessments under a single rate structure, cannot fairly be read to prohibit the legislature's power to classify property for rate-setting purposes once a uniform assessment methodology is in place.  The court did not hold that the Uniformity Clause bars the legislature from establishing different nominal tax rates for reasonably distinct classes of property once the properties' values were reassessed. And it did not limit the legislature's authority to create different property classifications and apply different tax rates based on uniform assessments.

---

[91] *Id.* at 486 ("The counties have used the same assessed values for so long that taxpayers . . . experience quite different effective rates of taxation . . . . The underlying assessed values diverge from present fair market value to such a degree that the reality is a profound lack of uniformity."); *see supra* note 4 (providing a hypothetical to explain this holding).

[92] *Pub. Schs.*, 239 A.3d at 496.

[93] *See* Defs.' Opening Br. 17-18, 31-39 (making this argument); Defs.' Answering Br. 23-24 (same).

iv.  *Pennsylvania Law*

Finally, the plaintiffs cite Pennsylvania case law to support their construction of the Uniformity Clause as prohibiting classifications.[94]  They accurately note that Delaware's Uniformity Clause was copied from the Pennsylvania Constitution, a textual similarity and linkage acknowledged by Delaware courts.[95]  The plaintiffs highlight this historical reliance on Pennsylvania law as evidence that Pennsylvania interpretations should carry significant weight when construing Delaware's identical clause.[96]  Following this logic, the plaintiffs contend that modern Pennsylvania precedent viewing real property as a single class shows that HB242 is facially unconstitutional.[97]

Delaware courts have, however, taken a different approach from Pennsylvania and consistently interpreted our Uniformity Clause to permit the reasonable

---

[94] Pls.' Opening Br. 33-34.

[95] *Id.* at 35; *see Zoller's Est.*, 171 A.2d at 379-80 (addressing territorial uniformity).

[96] *See* Pls.' Opening Br. 35-36; Pls.' Answering Br. 28-29.

[97] *See* Pls.' Opening Br. 36-37 (citing Pennsylvania cases); *Valley Forge Towers Apartments N, LP v. Upper Merion Area Sch. Dist.*, 163 A.3d 962, 975 (Pa. 2017) (commenting that "all property in a taxing district is a single class[,]" meaning that the government cannot "treat different property subclassifications in a disparate manner"); *Downington Area Sch. Dist. v. Chester Cnty. Bd. of Assessment Appeals*, 913 A.2d 194, 199 (Pa. 2006) (stating that "all properties in the relevant taxing district are comparable properties" under Pennsylvania's Uniformity Clause).

classification of real property for taxation purposes.[98]  As the defendants highlight, Pennsylvania shifted to its stricter interpretation of the Uniformity Clause decades after Delaware's adoption.[99]  The uneven evolution of jurisprudence in a sister state does not override Delaware courts' steady interpretation of our Constitution as permitting reasonable classification.

### b. The As-Applied Challenge

The plaintiffs argue that even if HB242 is facially valid, it is unconstitutional "as applied by the School Board[s]."[100]  This theory focuses on the law's implementation: whether the defendants' "arbitrary misclassification of thousands of properties" created non-uniformity in practice.[101]  To evidence their concern, the plaintiffs cite examples of nearly identical apartment buildings, located blocks apart,

---

[98] *See, e.g.*, *Phila., B. & W. R.*, 57 A.2d at 765; *Brennan*, 104 A.2d at 797 (holding that the "requirement of uniformity in the rate of taxation" of real property prohibits "[d]eliberate discrimination between the taxpayers in the valuation of similar property"); *supra* note 74 and accompanying text.

[99] *See* Defs.' Answering Br. 10-12 (explaining that when Delaware adopted Pennsylvania's Uniformity Clause in 1897, Pennsylvania permitted classification).

[100] Am. Compl. ¶ 185.

[101] *See* Pls.' Opening Br. 20 (italics omitted); Am. Compl. ¶ 185.

being classified differently—one residential and one non-residential—and therefore subject to different tax rates.[102]

Our Constitution does not demand perfection from a tax system. To be unconstitutional, the system's flaws must be pervasive and systemic, meaning that they are widespread and built into the system itself. A challenger must show that these flaws demonstrate either deliberate discrimination or create a "uniformly non-uniform" system.[103] Simple administrative mistakes that can be corrected do not meet this high standard.

The errors complained of in the statewide property database are not systemic or pervasive, but correctable. Of the 213,817 properties in New Castle County, approximately 1,409 were misclassified in a way that affected their tax rate—an error rate of 0.66%.[104] This error rate does not suggest that the statute is being applied in an irrational or "clearly arbitrary" manner.[105] It merely demonstrates administrative difficulties.

---

[102] Pls.' Opening Br. 16-21.

[103] *Pub. Schs.*, 239 A.3d at 496; *see also Brennan*, 104 A.2d at 797.

[104] Defs.' Answering Br. 40; *see also infra* notes 131, 216-217.

[105] *Betts*, 263 A.2d at 293; *see also Conard*, 16 A.2d at 125.

In any event, the County is working to correct these errors through a recently adopted formal policy.[106] The availability of a corrective process for affected taxpayers weighs against any as-applied constitutional violation. The isolated examples of misclassification are correctable administrative errors, not evidence of a system deliberately designed to be non-uniform. The as-applied challenge is meritless.

*  *  *

"The issue before [me] is the constitutionality of the tax measure—not whether the rate structure is the most fair, or the most practical, or the most wise."[107] HB242 meets that standard. It distinguishes—reasonably so, under the circumstances—between a residential and non-residential property class, as permitted by the Uniformity Clause and Delaware precedent.

By its terms, HB242 "operates alike and uniformly" within a class.[108] All properties classified as residential in New Castle County are treated alike. The same is true for non-residential properties. The administrative errors in implementing these classifications are not pervasive or systemic enough to make HB242

---

[106] *See* Suppl. Decl. of Denzil J. Hardman (Dkt. 96) ("Hardman Suppl. Decl.") Ex. A (Policy Regarding Correction of Errors in Assessment Classification Used for Tax Purposes, dated Oct. 14, 2025) ("County Reclassification Policy"); *see* Pls.' Ex. 70; *see also* Defs.' Answering Br. 8.

[107] *Betts*, 263 A.2d at 292.

[108] *Aetna Cas. & Sur. Co.*, 131 A.2d at 178.

unconstitutional as applied, especially given the County's corrective process. Because HB242 does not violate the Uniformity Clause on its face or as applied, Count I fails.

### 2. Retroactive Taxation (Count II)

Next, the plaintiffs bring a claim under Article VIII, Section 9 of the Delaware Constitution (the "Personal Income Tax Clause"), which prohibits retroactive taxation on "personal income."[109]  A tax is retroactive when it taxes events occurring before a given statute's enactment.[110]  Enacted in August 2025, HB242 modifies tax rates for a fiscal year that began the preceding July.[111]  In dispute is whether this retroactive modification constitutes an increase in the rate of taxation on personal income under Article VIII, Section 9.

The plaintiffs argue that HB242 contravenes the Personal Income Tax Clause because the 2025 reassessment used an "income approach" to value their

---

[109] Del. Const. art. VIII, § 9; *see* Pls.' Opening Br. 57.

[110] *See* Saul Levmore, *The Case for Retroactive Taxation*, 22 J. Legal Studs. 265, 266 (1993) ("[R]etroactive taxation, or other civil legislation, can be defined as entailing (that is, rewarding or burdening) triggering events that occurred in the past."); *see also* Julie Roin, *Retroactive Taxation, Unfunded Pensions, and Shadow Bankruptcies*, 102 Iowa L. Rev. 559, 565 (2017) ("[R]etroactive taxation may appear to be just another way of passing off the cost of government to 'the man behind the tree' who is not only unseen, but in no position to defend against the imposition of an unfair burden." (citation omitted)).

[111] HB242 § 1(1); Stipulated Facts ¶¶ 25, 38-49; *supra* note 40 (quoting HB242 in full).

properties.[112]  Their challenge is an as-applied one concerning whether their members, whose non-residential properties were assessed using the income approach, yielded rent-based valuations.  But their claim obfuscates the plain meaning of the constitutional provision.  It fails for this reason alone.

a.  The Personal Income Tax Clause

Once again, my analysis begins with the constitutional text.  Article VIII, Section 9 of the Delaware Constitution states that "[a]ny law which shall have the effect of increasing the rates of taxation on personal income for any year or part thereof before the date of the enactment thereof . . . shall be void."[113]  Because the provision is unambiguous, I need not read beyond the plain text.[114]

Perhaps self-explanatorily, the provision refers to personal income—not property—taxes.  The two are distinct concepts.  An "income tax" is "[a] tax on an individual's or entity's net income."[115]  Personal income is the "total income

---

[112] *See* Am. Compl. ¶ 195.

[113] Del. Const. art. VIII, § 9.  Notably, the parties cite no case law so much as mentioning this provision.  My own research has uncovered none.

[114] *See Marker v. State*, 450 A.2d 397, 399 (Del. 1982) ("Constitutional phrases must, if possible, be given their ordinary or plain meaning . . . [such that] the words found therein must be given the meaning ordinarily ascribed to them."); *Op. of the Justs.*, 274 A.3d at 272.

[115] *Tax*, Black's Law Dictionary (12th ed. 2024).

received by an individual from all sources."[116]  A "property tax," by contrast, is defined as "[a] tax levied on the owner of [the] property (esp[ecially] real property), usu[ally] based on the property's value."[117]  As Henry Campbell Black's foundational treatise on income tax observes:

> An income tax is distinguished from other forms of taxation in th[e] respect[] that it is not levied upon property, nor upon the operations of trade and business or the subjects employed therein, nor upon the practice of a profession or the pursuit of a trade or calling, but upon the acquisitions of the taxpayer arising from one or more of these sources or from all combined.[118]

The tax authorized by HB242 is an *ad valorem* property tax—a tax according to "the value of the property" itself.[119]  It does not tax the acquisitions or profits of the taxpayer.  The language of the Personal Income Tax Clause is specific, and if the framers had intended this prohibition to apply to all forms of taxation, they could have used broader language.[120]

---

[116] *Income*, Black's Law Dictionary (12th ed. 2024) (defining "personal income" in a sub-category).

[117] *Tax*, *supra* note 115.

[118] *Id.* (quoting Henry Campbell Black, *A Treatise on the Law of Income Taxation Under Federal and State Laws* § 1, 1 (1913)).

[119] *Id.* (quoting 71 *Am. Jur. 2d State and Local Taxation* § 20, Westlaw (database updated May 2025)).

[120] The drafters of the Personal Income Tax Clause, or its subsequent editors in the legislature, could have included property taxes within the provision, much like in the Uniformity Clause.  But they did not.  *Cf. Leatherbury*, 939 A.2d at 1291 ("Where, as here, when provisions are expressly included in one statute but omitted from another, we must conclude that the General Assembly intended to make those omissions.").

The distinction between property and income taxes is underscored by the division between the authority to tax income and property in Delaware. The State taxes personal income.[121] Counties, municipalities, and school districts tax real property.[122] School districts lack the statutory authority to levy taxes on personal income, confirming that the tax at issue is a tax on real property.

### b. The "Income Approach"

The plaintiffs ask this court to overlook the Personal Income Tax Clause's text and focus on the method used to calculate the property taxes. They maintain that because Tyler's assessment of non-residential properties relied on an "income approach" that measured the "income stream associated with" the property, the tax is functionally one with the plaintiffs' members' personal incomes.[123] This argument confuses the method used to calculate the property tax with the nature of the tax itself.

Using an income-based approach to raise property taxes does not create a personal income tax. Instead, it is a standard appraisal methodology used to estimate

---

[121] 30 *Del. C.* §§ 1101-26.

[122] 9 *Del. C.* § 8002 ("A county governing body may adopt different tax rates for real property based on different real property classifications adopted by the county governing body."); *see also Am. Tel. & Tel. Co. v. Everett*, 152 A.2d 295, 299 (Del. Ch. 1959) (stating that the "provisions governing taxation of real property in Delaware contemplate taxation of such property by the counties or other political subdivisions of the State rather than by the State itself").

[123] Am. Compl. ¶ 195.

30

a property's fair market value with income as the input.[124] The income approach is Delaware's "preferred method [for] evaluating [the value of] income producing properties."[125] Relevant here, it is a technique to value real property, which is later taxed "by the counties or other political subdivisions of the State."[126] Its purpose is to determine what a willing buyer would pay for the property as an investment—not to tax the owner's income.[127]

There is an obvious distinction between this appraisal methodology and the plaintiffs' members' incomes. The income approach primarily uses market rental data and capitalization rates to estimate a hypothetical income stream, not the specific financial performance of a particular property.[128] The record shows that 99% of Tyler's valuations for non-residential properties were based on such market data rather than actual income data provided by the plaintiffs' members.[129]

To accept the plaintiffs' reasoning would lead to an absurd result where the same tax is simultaneously a "property tax" for a homeowner (valued using sales comparisons) and an "income tax" for a neighboring apartment building (valued

---

[124] *See Wilm. Hous. Auth. v. Greater St. John Baptist Church*, 291 A.2d 282, 284-85 (Del. 1972); *see also* Tyler Report 27-32 (describing the three methods).

[125] *Seaford Assocs., L.P. v. Bd. of Assessment Rev.*, 539 A.2d 1045, 1048 (Del. 1988).

[126] *Am. Tel. & Tel. Co.*, 152 A.2d at 299.

[127] *See* Tyler Report 29.

[128] Tyler Report 29-30; *see* Defs.' Opening Br. 51.

[129] Hardman Decl. ¶¶ 8-10; *see* Defs.' Opening Br. at 51.

31

using the income approach). The nature of a tax does not change based on the appraisal technique used to value the underlying asset. Regardless of the appraisal method used, the final tax is levied on the resulting assessed value of the real estate, not the dollars of income the property generates in a given year.

$$* \qquad * \qquad *$$

Article VIII, Section 9 of the Delaware Constitution does not apply to the property taxation scheme contemplated by HB242. The use of an income approach to value certain properties does not convert a tax on property into a tax on personal income. Count II therefore fails.

### 3. The Due Process Clause (Count VI)

The plaintiffs next contend that the County defendants' plan to correct certain property classifications after the School Boards set tax rates under HB242 violates the Due Process Clause of the Fourteenth Amendment of the United States Constitution.[130] The County has identified approximately 1,409 properties that "are misclassified in such a way that correcting the error in classification will change the property's designation as residential or non-residential for tax purposes."[131] The

---

[130] Am. Compl. ¶¶ 228-37.

[131] *See* Hardman Suppl. Decl. ¶ 4 (stating that 1,382 properties are misclassified); Decl. of Nicholas J. Brannick ¶ 2 (addressing a spreadsheet error); Trial Tr. 14, 18 (stating that the County had identified another 28 misclassified properties). I use the higher, 1,409 figure in this decision. *See infra* notes 213-214.

plaintiffs argue that reclassifying 966 of those properties from the residential to higher-taxed non-residential category, without adequate notice or an opportunity to be heard, constitutes an unconstitutional deprivation of property.[132]

The Fourteenth Amendment provides that a state cannot "deprive any person of life, liberty, or property, without due process of law."[133] "The fundamental requirement[s]" of procedural due process are notice and "the opportunity to be heard at a meaningful time and in a meaningful manner."[134] Due process is "flexible and calls for such procedural protections as the particular situation demands."[135] In the taxation context, states need not provide pre-deprivation remedies.[136] Post-deprivation remedies, like an opportunity to "dispute . . . the validity of the tax assessment" and "a partial refund to petitioner[,]" are sufficient.[137]

---

[132] Am. Compl. ¶¶ 230, 232-33.

[133] U.S. Const. amend. XIV, § 1. The Delaware Constitution's due process protections are coextensive with the United States Constitution. *See Blinder, Robinson & Co. v. Bruton*, 552 A.2d 466, 472 (Del. 1989).

[134] *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (citation omitted); *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 53 (1993).

[135] *Slawik v. State*, 480 A.2d 636, 645 (Del. 1984); *see also W.L. Gore & Assocs., Inc. v. Wu*, 2006 WL 905346, at *4 (Del. Ch. Mar. 30, 2006) (stating that "[t]he amount of process required to safeguard an individual's due process rights varies greatly depending on the facts and issues involved in each case").

[136] *McKesson Corp. v. Div. of Alcoholic Beverages & Tobacco, Dep't of Bus. Regul. of Fla.*, 496 U.S. 18, 36-37 (1990) ("[States] may choose to provide a form of 'predeprivation process,' . . . [but] it is well established that [they] need not [do so].").

[137] *Id.* at 37, 41.

The plaintiffs' procedural due process claim falters at the threshold because they have not shown a protected private interest implicated by the County's correction of classification errors. Even if they articulated a sufficient interest, the *Mathews v. Eldridge* balancing test also weighs against the plaintiffs.[138] Without demonstrating a cognizable due process deprivation, Count VI fails.

### a. Protected Property Interest

Procedural due process protections are triggered only by the deprivation of a protected interest in life, liberty, or property.[139] To have a protected interest in a government benefit, "a person clearly must have more than an abstract need or desire" or a "unilateral expectation of it."[140] She must have "a legitimate claim of entitlement to it."[141] Such entitlements arise from independent sources like state law—not from the Constitution itself.[142]

The plaintiffs claim a property interest in the retention of a favorable—albeit incorrect—property classification.[143] But taxpayers generally lack a vested property right in the continuation of a tax classification, not to mention the perpetuation of an

---

[138] *See infra* note 163 and accompanying text.

[139] *See* U.S. Const. amend XIV, § 1.

[140] *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972).

[141] *Id.*

[142] *See Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005).

[143] Am. Compl. ¶ 230.

administrative error that results in lower taxes.[144]  The deprivation alleged here is

not a legitimate entitlement, but the loss of an effective tax windfall resulting from

an administrative error in classification.[145]  Absent a protected property interest in

the erroneous classification, the Due Process Clause is not implicated by its

correction.

b.      Adequacy of Post-Deprivation Remedies

The plaintiffs counter that the relevant property interest is the money being

taxed due to the misclassification.[146]  In *McKesson Corp. v. Division of Alcoholic

Beverages & Tobacco, Department of Business Regulation of Florida*, the United

States Supreme Court held that the "exaction of a tax constitutes a deprivation of

property."[147]  As a result, the state must "provide procedural safeguards against

---

[144] *See Welch v. Henry*, 305 U.S. 134, 146-47 (1938); *cf. Croda, Inc. v. New Castle Cnty.*, 2021 WL 5027005, at *4 (Del. Ch. Oct. 28, 2021) (noting that landowners lack vested rights against zoning changes).

[145] *See* Trial Tr. 54-56.

[146] Am. Compl. ¶ 235.  The plaintiffs also assert that the "absence of any mechanism to contest or obtain review of a property reclassification" amounts to a deprivation of property without due process.  *Id.* ¶ 234.  I questioned the plaintiffs on this point at trial and was told that "it's pretty clear that when you're changing somebody's tax, there is absolutely a due process interest in having a meaningful process around how that is going to be determined and having both whatever administrative process that the government may stand up, but as well as having the right to judicial review."  Trial Tr. 55.  After reviewing the plaintiffs' papers, however, I cannot locate support for this proposition.  *Cf. Cohen v. State ex rel. Stewart*, 89 A.3d 65, 88 (Del. 2014) (providing that "vague and amorphous interest[s]," resting on an inadequate foundation, do not "constitute a property interest that deserve[s] substantial weight").

[147] 496 U.S. at 36.

35

unlawful exactions in order to satisfy the commands of the Due Process Clause."[148]

Yet, *McKesson* held that post-deprivation remedies are generally sufficient in the tax context. That principle applies here.

Even if the increased tax liability resulting from the reclassification involves a loss of protected property (i.e., the money paid), the available post-deprivation procedures satisfy due process. The Supreme Court has recognized that requiring taxpayers to pay first and litigate later is constitutionally permissible given the government's strong interest in prompt revenue collection.[149] The essential factor is the availability of a "clear and certain remedy" after payment.[150] Both Delaware law and County policy provide such remedies through a multi-level post-deprivation process.

The plaintiffs primarily argue that adequate process is lacking because the statutory deadline for assessment appeals has passed. This argument rests on a false equation of assessment with classification. Assessment is the process to "establish the market value" of parcels within a given district.[151] In contrast, properties are

---

[148] *Id*.

[149] *See id*. at 37 ("[I]t is well established that a State need not provide pre-deprivation process for the exaction of taxes.").

[150] *Id.* at 39.

[151] Tyler Letter 4; *see also* 2 John Martinez, *Local Government Law* § 23:16, Westlaw (database updated Oct. 2025) (describing a two-step process: (1) a "list or roll of taxable property" is compiled, and (2) a "valuation of that property" occurs).

classified—by the State, the County, and school districts—to assign certain property tax rates.[152]  These are separate events, taking place at different times.[153]

Thus, the unavailability of the assessment appeal process under 9 *Del. C* § 8311 is not dispositive.  That statutory process, with its March 31 deadline, governs challenges to the assessed value (i.e., fair market value) determined during a reassessment.[154]  It does not, by its terms, apply to disputes over property classification used for applying tax rates.

First, property owners receive notice of their classifications and applicable tax rates through their tax bills.  At trial, the County expressed its willingness to provide specific notice of any classification change in the revised bills.[155]

---

[152] HB242 §1(1); *see also* 22 *Del. C.* § 1107 (delegating authority to municipalities to assign different tax rates for residential and non-residential real property).

[153] In conducting an assessment, assessors may rely on certain classifications to conduct their valuations.  This was true for Tyler's 2025 reassessment.  *See* Tyler Report 8-9.  But the classifications relied on by Tyler are different in meaning and scope from those promulgated by the County.  For example, New Castle County defines "residential" property as that "classified as either Residential or Farmland" in the County's parcel records. Defs.' Ex. H (Substitute No. 1 to New Castle County Ordinance No. 25-048) § 10; *see also* Stipulated Facts ¶ 107.  It defines "non-residential" property as that "classified as any classification other than Residential or Farmland" in the County's parcel records. Defs.' Ex. H § 10; *see also* Stipulated Facts ¶¶ 56, 117-18.  Tyler's report does not expressly define "residential" properties, but it treats agricultural, commercial, and industrial properties as "non-residential."  Tyler Report 11, 17.

[154] *See* 9 *Del. C.* § 8311(a).  The Board of Assessment Review's jurisdiction appears limited to matters of improper assessment.  *Id.* § 1371B(1).

[155] *See* Trial Tr. 122-23 (confirming that the County is willing to "send out a notice with the tax bill" that will inform taxpayers of their ability to challenge the reclassification under the new policy).  I view that as a prudent and necessary step to ensure adequate notice.

Second, property owners may pursue administrative challenges to their classifications through the County's recently adopted Policy Regarding Correction of Errors in Assessment Classification Used for Tax Purposes.[156] The plaintiffs emphasize that the County adopted this formal policy only after their lawsuit was brought, suggesting that it recognized a prior process gap. They note that the policy lacks preexisting statutory authority beyond general administrative functions. Still, the policy's adoption demonstrates a commitment to providing a defined post-deprivation process.

Under the policy, a taxpayer may submit a written challenge of a property classification to the New Castle County Division of Assessment within six months from the billing date, and a written decision will be issued within 60 days of submission.[157] The policy is untested in practice due to its recent adoption. But it is an available administrative avenue providing the first step for resolving classification disputes.[158]

---

[156] *See supra* note 106 and accompanying text.

[157] County Reclassification Policy, Procedure (3); 10 *Del. C.* § 8125. The County policy was adopted amid the present litigation. Before its adoption, the County used an informal, ad hoc procedure. I do not see a due process issue with this timing because the new policy is in place before taxpayers receive their new tax bills, which will reflect any reclassification. *See* Trial Tr. 119-22.

[158] The plaintiffs caution that the policy can be rescinded as easily as it was adopted. Pls.' Answering Br. 23-24 (describing the policy as "entirely a matter of administrative grace"). At trial, defendants insisted that their concern is needless for two reasons. First, the official

38

Third, if dissatisfied with the Division of Assessment's decision, a property owner may pursue judicial intervention.[159]  She may file a writ of certiorari to the Superior Court, which allows the court to review the County's final administrative decision for errors of law.  Although the plaintiffs question the adequacy of this relief, courts have deemed a writ of certiorari appropriate and adequate for reviewing classification determinations.[160]  Despite the practical impossibility of completing both an administrative challenge and certiorari review before the November 30 payment deadline, taxpayers retain the ability to recover later, consistent with the post-deprivation framework permitted under *McKesson*.  Both State and County law provide mechanisms for refunding taxes paid erroneously.[161]

---

policy squares with the County's preexisting informal practices.  And second, the County "has represented to this court and is asking this court to rely on this policy," while understanding the implications of such an ask.  Trial Tr. 119-20.  I take the County at its word.

[159] County Reclassification Policy, Procedure (3); *see* New Castle Cnty. Code §§ 14.03.001-.002; 14 *Del. C.* § 1921.

[160] *See Goldstein v. City of Wilm.*, 598 A.2d 149, 152 (Del. 1991); *Green v. Sussex Cnty.*, 668 A.2d 770, 773 (Del. Super. 1995); *Gillespie v. Sussex Cnty.*, 1999 WL 463532, at *1 (Del. Super. Mar. 31, 1999) (stating that the Superior Court has jurisdiction to "review the legality of property assessments[,]" which may include a review of the classification).  The plaintiffs caution that the Superior Court does not review factual determinations below and instead limits its review to errors of law.  Pls.' Answering Br. 22-23.  The appliable standard, however, requires a meaningful opportunity to be heard—not the best possible review.  As discussed, the overall process provided meets the minimum constitutional requirement for due process.

[161] New Castle Cnty. Code §§ 14.03.001-.002; 14 *Del. C.* § 1921.

This combination of notice, administrative challenge, judicial review, and a refund mechanism constitutes a "clear and certain" remedy sufficient for due process to correct tax classifications.[162]

### c. *Mathews* Balancing

To assess the process due in a specific context, courts apply the three-factor balancing test from *Mathews v. Eldridge*, considering:

> [(1)] the private interest that will be affected by the official action; [(2)] the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and [(3)] the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedur[es] . . . would entail.[163]

An application of these factors confirms the constitutional adequacy of the County and State's post-deprivation process.

The first factor considers the private interest.[164] That interest is purely financial: the payment of higher taxes due to a corrected classification. This interest is personally significant to any taxpayer, but the constitutional interest is diminished. The plaintiffs are not being deprived of a vested legal entitlement. They are being

---

[162] *McKesson*, 496 U.S. at 39 (stating that post-deprivation remedies, like a "fair opportunity to challenge the accuracy and legal validity of their tax obligation," that also provide a "'clear and certain remedy' . . . for any erroneous or unlawful tax collection[,]" are sufficient (citing *Atchison, Topeka, & Santa Fe Ry. Co. v. O'Connor*, 223 U.S. 280, 285 (1912))); *see State v. Rumpff*, 308 A.3d 169, 197 (Del. Super. 2023).

[163] *Eldridge*, 424 U.S. at 335.

[164] *W.L. Gore*, 2006 WL 905346, at *4.

asked to pay the correct tax after benefitting from an error. The post-deprivation refund process protects their core interest in paying no more than what is lawfully due.

As for the second factor, which involves the risk of error and value of added safeguards, the potential for erroneous deprivation is mitigated by the post-deprivation challenge and refund process. Though the plaintiffs highlight potential errors in the County's reclassification data, the new administrative policy allows these issues to be addressed. To require a universal pre-deprivation hearing for potentially thousands of classification corrections before revised tax bills are issued would impose undue administrative burdens. It would also be of limited incremental value compared to the available post-deprivation review and refund remedy.

Finally, regarding the third factor, the government's interests are substantial. There is a strong interest in accurate and uniform application of tax laws, which logically includes correcting classification errors.[165] There is also an essential interest in the timely and orderly collection of tax revenue to fund public services (schools) and maintaining financial stability—an interest underscored by the

---

[165] *See McKesson*, 496 U.S. at 37 (discussing the government's "exceedingly strong interest in financial stability in th[e] context" of taxation).

November 30 deadline for all taxpayers.[166]   Attempting mass pre-deprivation hearings on a highly expedited timeline before that deadline would risk significant administrative chaos, increased taxpayer confusion, and delayed revenue collection. Postponing the individualized challenge process until after the revised bills are issued serves these significant interests, aligning with the principle that tax collection need not await pre-deprivation resolution where adequate post-deprivation remedies exist.[167]

Balancing these factors, the post-deprivation remedies provided by County policy and State law are constitutionally sufficient for the correction of property tax classifications.   That is especially true considering the limited nature of the private interest (avoiding payment of the correct tax during one fiscal year) and the substantial government interests in efficient tax administration and revenue collection.

*          *          *

The plaintiffs have not established a protected property interest in an erroneous tax classification.   Had they, the post-deprivation administrative and judicial remedies available to affected property owners provide a clear and certain

---

[166] *See id.*

[167] *Id.*

remedy sufficient to satisfy the requirements of the Due Process Clause in this tax context.  Judgment on Count VI is for the defendants.

### B.  Statutory and Ultra Vires Claims (Counts III, IV, and V)

The plaintiffs' remaining claims allege that the defendants' actions were ultra vires, or beyond their legal authority.[168]  Rather than challenge the constitutionality of the underlying statutes, these claims suggest that the defendants violated the statutes' plain terms.

Each claim presents pure questions of law and statutory interpretation.[169]  The presumption of constitutionality does not apply.  Instead, the plaintiffs must prove, by a preponderance of the evidence, that the defendants exceeded the authority granted to them by the legislature.[170]

"The rules of statutory construction are well settled."[171]  The court must determine "whether the statute under consideration is ambiguous," meaning that the statute is "susceptible of two reasonable interpretations."[172]  If a statute "is

---

[168] *See Haddock v. Bd. of Pub. Educ. in Wilm.*, 84 A.2d 157, 162-63 (Del. Ch. 1951) (holding that a school board's action was ultra vires because it did not "comply with the strict provisions of the statute"); *see supra* note 48 (defining "ultra vires").

[169] *See Taylor v. Diamond State Port Corp.*, 14 A.3d 536, 538 (Del. 2011) (outlining the rules of statutory construction).

[170] *See Oberly v. Howard Hughes Med. Inst.*, 472 A.2d 366, 390 (Del. 1984) (noting the preponderance of the evidence standard in the Court of Chancery).

[171] *Taylor*, 14 A.3d at 538.

[172] *Id.*

43

unambiguous, then [the court] give[s] the words in the statute their plain meaning."[173] If a statute is "ambiguous, however, then [the court] consider[s] the statute as a whole, rather than in parts, and . . . read[s] each section in light of all others to produce a harmonious [text]."[174] "[T]he golden rule of statutory interpretation . . . is that unreasonableness of the result produced by one among possible interpretations . . . is reason for rejecting that interpretation in favor of another which would produce a reasonable result."[175]

### 1. Ultra Vires for Lack of Referendum (Count III)

The plaintiffs claim that the School Boards acted outside their statutory authority by increasing tax rates for non-residential properties without first obtaining voter approval through a referendum.[176] 14 *Del. C.* § 1916(b), passed in 1972, sets out a two-step process for school boards to adjust tax rates after a general reassessment of property values.[177] First, the school boards make an initial rate

---

[173] *Id.* (citation omitted); *see also CML V LLC v. Bax*, 28 A.3d 1037, 1041 (Del. 2011).

[174] *Taylor*, 14 A.3d at 538.

[175] *Del. Bay Surgical Servs., P.A. v. Swier*, 900 A.2d 646, 652 (Del. 2006) (citation omitted).

[176] Am. Compl. ¶¶ 199-207.

[177] The full text provides:

> Whenever the qualified voters of a reorganized school district have approved a specific rate of taxation or specified amount of taxation under § 1903 of this title and a subsequent general reassessment of all real estate in the county changes the total assessed valuation of the school district, the local board of

44

calculation that may increase revenue by up to 10% compared to the fiscal year before the reassessment.[178]  Second, any further increases by the school board must be put to a referendum:[179]

> [A]ny subsequent increase in rate of taxation shall be achieved *only by an election of the qualified voters* in such local school district according to the procedures in § 1903 of this title.[180]

---

education of each such local school district shall calculate a new real estate tax rate which, at its maximum, would realize no more than 10% increase in actual revenue over the revenue derived by real estate tax levied in the fiscal year immediately preceding such reassessed real estate valuation.  In the event the qualified voters of a reorganized school district approve a specific rate of taxation or specified amount of taxation under § 1903 of this title to be collected, and there is a reassessment effective after voter approval, but before actual revenue is derived from increased taxation resulting from such voter approval, the local board of education of each such local school district shall calculate a new real estate tax rate which, at its maximum, would realize no more than a 10% increase in actual revenue over the revenue announced, projected or calculated to be derived by such voter approval and prior voter approvals.  Any subsequent increase in rate of taxation shall be achieved only by an election of the qualified voters in such local school district according to the procedures in § 1903 of this title.

14 *Del. C.* § 1916(b); *see also id.* §1903 ("Before any school board levies a tax under § 1902 of this title, it shall determine whether the tax shall be on the basis of a specified amount or of a specified rate of taxation and shall call a special election to be held at the polling place or places designated by the Department of Elections conducting the election. There shall be not more than 2 such special elections held during any 12-month period."); *id.* § 1911 ("If the majority of the votes cast at the election, under § 1903 of this title, shall be for additional tax, the tax shall be levied and collected as provided in this chapter.").

[178] *Id.* § 1916(b); *see supra* note 177 (quoting the statute in full).

[179] These referendum requirements do not apply to defendant New Castle County Vocational Technical School District, which is governed by a different statute.  *See* 14 *Del. C.* § 2601(c) (addressing post-reassessment rate setting for vocational technical districts).

[180] *Id.* § 1916(b) (emphasis added); *see supra* note 177 (quoting the statute in full).

The plaintiffs assert that the School Boards completed the first step when they set new tax rates in July 2025 and issued tax warrants after the reassessment. They view the School Boards' later approval of even higher rates for non-residential properties under HB242 as a "subsequent increase" that implicates the statute's second step.[181] The statute was violated, they argue, because the School Boards failed to put the revisions to a voter referendum.[182]

This claim centers on the interplay between Section 1916(b), which concerns post-reassessment tax adjustments, and HB242. A careful assessment of the relevant statutes reveals that the referendum process addressed in Section 1916(b) is in tension with HB242's specific directives. Because HB242 provides a limited exception to the general rule in Section 1916(b), the School Boards acted within their statutory authority.

### a. Increase or Reallocation

To start, I consider whether the action authorized by HB242 constitutes a "subsequent increase in rate of taxation" under Section 1916(b).[183] Read in context, Section 1916(b)'s referendum requirement applies when a school district seeks to

---

[181] *See* Pls.' Answering Br. 47, 50.

[182] *See id.* at 47-50.

[183] 14 *Del. C.* § 1916(b); *see* Defs.' Opening Br. 55 n.216 ("The process at issue in the instant matter permits school districts to increase tax rates so as to realize up to a 10% projected increase in revenue, or projected revenue, following a reassessment.").

increase its overall authorized revenue beyond the level set immediately after a reassessment, which itself permits up to a 10% increase. The referendum requirement gives voters the ability to approve a higher overall tax burden on the community to support a school district's increased spending.[184]

HB242, however, explicitly prohibits such an increase. It requires revenue neutrality compared to the original 2025-2026 tax warrant.[185] It permits a reallocation of the taxes being levied between different classes of property, not an increase in the total levy itself.[186]

That is, HB242 does not increase the overall tax burden authorized for a school district. It merely reapportions how that existing burden is shared within a revenue-neutral framework. This reapportionment does not trigger the referendum requirement of Section 1916(b) because the statute's core purpose—voter approval for higher overall taxes—is not implicated.

b. The Practical Conflict

Even if the rate adjustment under HB242 were an "increase" subject to Section 1916(b), the plaintiffs' claim still fails because the statutes conflict in operation. "[W]hen the General Assembly enacts a later statute in an area covered by a prior

---

[184] *See supra* note 177 (quoting Section 1916(b) in full).

[185] *See* HB242 § 1(1); *supra* note 40 (quoting HB242 in full).

[186] *See* HB242 § 1(1); *see also* Defs.' Answering Br. 53 (explaining this point).

statute, it has in mind the prior statute[,]" such that "statutes on the same subject must be construed together . . . unless there is an irreconcilable conflict . . ., in which case the later supersedes the earlier."[187] Harmonization is impossible given HB242's explicit timeline.

HB242 begins:

> *Notwithstanding any provision of law to the contrary*, . . . the school board of a school district located entirely in New Castle County may, for the 2025-2026 school tax year, reset the local school tax rate using a residential and a non-residential tax rate.[188]

It directs that any such new rates "must be reported to the County and delivered with a new warrant *not later than 10 business days* from the effective date of this Act."[189] Enacted on August 12, 2025, this text required action by August 26.[190] The compressed timeframe reflects the emergency nature of legislation aimed at providing immediate relief and certainty for the County, school districts, and taxpayers before new tax bills were due this fall.

---

[187] *State, Dep't of Lab. v. Minner*, 448 A.2d 227, 229 (Del. 1982); *see also Wilm. Tr. Co. v. Barron*, 470 A.2d 257, 264 (Del. 1983) (explaining that "it is assumed that whenever the legislature enacts a provision it has in mind previous statutes relating to the same subject matter," and so "in the absence of any express repeal or amendment therein, the new provision was enacted in accord with the legislative policy embodied in those prior statutes").

[188] HB242 § 1(1) (emphasis added); *see supra* note 40 (quoting HB242 in full).

[189] HB242 § 1(1) (emphasis added).

[190] *Id.* § 1(2).

The referendum process set by Section 1916(b) (incorporating Section 1903 procedures) requires more time than was available. Even absent specific minimum notice periods in Chapter 19 itself, general election statutes require published notices.[191] The logistical requirements of holding special elections across multiple large school districts could not plausibly have been met within ten business days. This reality leaves the plaintiffs' suggestion that the School Boards could have complied with both statutes factually untenable. To enforce compliance with Section 1916(b) would bar realistic compliance with HB242's mandatory deadline, leaving the relief authorized by HB242 a nullity.

This irreconcilable conflict triggers settled canons of construction. HB242, enacted decades after the relevant provisions of Section 1916(b), specifically addresses the unique circumstances of the 2025-2026 tax year in New Castle County post-reassessment. Section 1916(b) provides a general rule that applies statewide and across time. "[W]hen a specific statute is enacted that appears to conflict with an existing general statute, the subsequently enacted specific statute is controlling."[192]

---

[191] *See, e.g.*, 14 *Del. C.* § 1074(b).

[192] *Cede & Co. v. Technicolor, Inc.*, 758 A.2d 485, 494 (Del. 2000).

That conclusion is reinforced by HB242's preface: "[n]otwithstanding any provision of law to the contrary . . . ."[193]  As the United States Supreme Court has recognized, this clause "signals the drafter's intention that" the text that follows "override[s] conflicting provisions of any other section."[194]  The General Assembly's inclusion of the clause reveals its intent that preexisting procedures, like the referendum process in Section 1916(b), not impede HB242's time-sensitive operation.  Insisting on a referendum would contravene this legislative command and defeat HB242's very purpose.

*　　　　*　　　　*

HB242 governs as a limited exception to the general referendum requirement of § 1916(b).  The School Boards' actions in resetting the tax rates under the authority and timeline granted in HB242, without holding a referendum, were not ultra vires.  Count III is resolved in the defendants' favor.

### 2.　　Ultra Vires for Failure to Capture Fair Market Value (Count IV)

The plaintiffs next contend that HB242 as implemented violates Delaware's "True Value Statute," 9 *Del. C.* § 8306, which mandates that all property "shall be

---

[193] HB242 § 1(1).

[194] *Cisneros v. Alpine Ridge Gp.*, 508 U.S. 10, 18 (1993); *see In re Fed.-Mogul Glob. Inc.*, 684 F.3d 355, 368-69 (3d Cir. 2012) (explaining that a federal "notwithstanding" clause preempted state law); *see also Notwithstanding*, Black's Law Dictionary (12th ed. 2024) (defining "notwithstanding" as "[d]espite, in spite of").

assessed at its fair market value."[195]  The claim proceeds in two steps.  First, the plaintiffs argue that because HB242 retroactively increased the tax burden on non-residential properties after the 2025 reassessment was finalized, the assessments no longer reflect the properties' fair market value.[196]  Second, they assert that they are being deprived of due process because the deadline to appeal assessments passed, leaving property owners with no recourse to challenge valuations that they believe were rendered inaccurate by the new law.[197]

### a.    Fair Market Value

The plaintiffs posit that HB242 contravenes the True Value Statute because the higher tax liability on non-residential properties causes a corresponding reduction to the properties' fair market values.  Since a willing buyer would pay less for a property that carries a larger tax bill, the plaintiffs reason, the recent assessment is now obsolete and inaccurate.[198]

This argument is rational from a purely economic standpoint.  But it fails as a matter of law based on the plain and unambiguous text of the True Value Statute. The statute does not define "fair market value" as a fluctuating figure that must be

---

[195] Am. Compl. ¶¶ 208-18; *see* 9 *Del. C.* § 8306.

[196] Pls.' Opening Br. 64-65.

[197] *Id.* at 66.

[198] *Id.* at 64-65.

updated with every change in market conditions or tax policy. Instead, it has a temporal limitation. The statute commands that property "shall be assessed at its fair market value *as of the date of the most recent reassessment base year* in the county."[199] For the 2025 reassessment, that date is July 1, 2024.[200]

Put differently, the statute creates a legal snapshot in time using a base year method, which the Delaware Supreme Court has confirmed is a permissible way to implement the constitutional mandate of tax uniformity.[201] By fixing the assessment value to a base year date, a uniform basis for levying taxes is set for the subsequent period. Events after the July 1, 2024 valuation date—such as the passage of HB242 in August 2025—are legally irrelevant to the validity of an assessment set according to the statutory base year.[202] To hold otherwise would ignore the statute's clear temporal limitation.

The plaintiffs' position also creates an unworkable, circular logic. An assessment establishes the foundational value on which a tax is calculated.[203] If the

---

[199] 9 *Del. C.* § 8306(a) (emphasis added).

[200] *See* Stipulated Facts ¶ 20; *see also* Defs.' Opening Br. 58.

[201] *See Bd. of Assessment Rev. for New Castle Cnty. v. Stewart*, 378 A.2d 113, 116 (Del. 1977); *see also* Defs.' Opening Br. 59.

[202] *See* Defs.' Opening Br. 58 (making this argument).

[203] Trial Tr. 112; *Carr v. Bd. of Assessment Rev.*, 1995 WL 109003, at *2 (Del. Super. Feb. 22, 1995) (defining assessment as the "assessment[] of the *value* of property for tax purposes").

resulting tax could retroactively invalidate the assessment, the process would become an endless loop. Every change in a tax rate would necessitate a new round of assessments, which would then require new tax rates, and so on. Such a system would be administratively unworkable and prevent the government from achieving the finality needed to collect revenue. The True Value Statute's method of linking valuation to a base date avoids this circularity.

### b. Due Process

The second part of the plaintiffs' argument is that the sequence of events creates a due process problem.[204] They assert that since HB242 was enacted after the March 31, 2025 deadline to appeal property assessments, they were deprived of a meaningful opportunity to be heard.[205] Had their members known the tax rates would ultimately be higher, the plaintiffs say, more would have challenged their initial assessed values.[206]

This argument is baseless. A property tax appeal is a challenge to the assessed value of the property as of the base year—not to the resulting tax liability.[207] The tax increase implemented under HB242 in August 2025 would have no legal bearing

---

[204] *See* Am. Compl. ¶ 216.

[205] *See* Pls.' Opening Br. 66.

[206] *See id.*

[207] *See* 9 *Del. C.* §§ 8311(a), 137B(1); *see also* Defs.' Opening Br. 66.

on a property's fair market value as of July 1, 2024, and could not have formed the basis for a successful tax appeal.[208] Because the plaintiffs' members were not deprived of the opportunity to make a meritorious argument, they were not prejudiced. And absent a showing of prejudice, their due process challenge fails.[209]

### 3. Ultra Vires for Lack of Revenue Neutrality (Count V)

The plaintiffs' final ultra vires claim involves whether HB242 is violated by the County's plan to reclassify properties after the School Boards set split rates.[210] The plaintiffs argue that the planned reclassification breaches HB242's revenue neutrality requirement because changing property classifications—particularly from residential to the higher non-residential tier—after fixing rates will cause total projected revenue to exceed the school districts' original projections.[211] They further maintain that this breach is incurable because the ten-business-day deadline for setting new rates lapsed in August.[212] Both arguments are belied by the plain text and practical application of HB242.

HB242 provides that if a school district resets its tax rates to distinguish between residential and non-residential properties, "[t]he total amount of revenue

---

[208] *See* Defs.' Opening Br. 66.

[209] *See id.* at 69.

[210] Am. Compl. ¶¶ 219-27.

[211] *See* Pls.' Opening Br. 21; Pls.' Answering Br. 6-13.

[212] Pls.' Answering Br. 4; *see* HB242 § 1(2).

*projected* to be collected through use of the [revised] tax rates may not exceed the total amount of revenue the district was *projected* to collect under its original 2025-2026 tax warrant."[213]  The use of "projected" is dispositive.[214]  It reveals that the School Boards had to calculate revenue based on the data available when tax rates were reset within the ten-business-day window after HB242's enactment.  HB242 imposes a duty to create a projection—an estimate—using the County's property classification data as it then existed.  It did not, and realistically could not, require perpetual alignment between the initial projection and the final, actual revenue collected after later data refinements or corrections.

HB242 lacks a knowledge element.  It does not say that a school district's collection must be accurate based on perfect data.  Nor does it require the School Boards or County to have identified all potential classification errors before a projection was made.  The School Boards were charged with setting a tax rate based on the official County data they possessed in the moment.  Their compliance with HB242 must be judged against that specific, time-bound requirement and the then-available data.

---

[213] HB242 § 1(1) (emphasis added); *see supra* note 40 (quoting the statute in full).

[214]  *Projection*, Merriam-Webster, https://www.merriam-webster.com/dictionary/projection (last visited Oct. 24, 2025) (defining the term as "an estimate of future possibilities based on a current trend"); *see also CPC Parts Delivery, LLC v. Ohio Bureau of Workers' Comp.*, 2024 WL 51232, at \*2 (Ohio Ct. App. Jan. 4, 2024) ("Revenue neutrality does not equate to cash flow neutrality.").

Even if a knowledge element could be read into the statute, the defendants would still prevail. HB242 was adopted on August 12, 2025, prompting an August 26 deadline for tax warrants. Although the County was aware of a handful of anecdotal classification flaws before then, knowledge of a potentially larger problem first arose on August 17, when a single member of the Christina School Board identified multiple misclassified properties.[215] This realization was five days after HB242's enactment, and halfway through the window the School Boards had to calculate, approve, and deliver new tax warrants. It would be unreasonable to expect the School Boards to halt their task and risk violating the statutory deadline to incorporate incomplete information possessed by one person in one school district rather than the official County data before them.

The full scale of errors since discovered remains relatively small.[216] The County identified errors affecting the classification of approximately 1,409 properties out of 213,817 countywide.[217] This is an error rate of 0.659%. It does not

---

[215] *See* Decl. of Kenneth N. Dunn, Sr. (Dkt. 85) ¶¶ 5-6.

[216] The plaintiffs argue that the error is not de minimis because it implicates $863 million of value. *See* Trial Tr. 18. The total dollars at issue has little bearing on the legal question of whether the School Boards complied with HB242's mandate to ensure projected revenue neutrality using the data available when rates were set. *Id.*

[217] *See* Hardman Suppl. Decl. ¶ 4; Defs.' Ex. I (Resp. and Objs. to Pls.' First Set of Interrog. to Defs.' Henry and Del Grande) ¶ 22; *supra* note 131.

make the overall classification system arbitrary or invalidate the School Boards' revenue projections.

The plaintiffs' reading of HB242 ignores the practical realities of tax administration. Tax rolls are dynamic. Classifications can change, new properties are added, values are adjusted through appeals, and supplemental assessments occur.[218] Requiring initial revenue projections to be accurate despite subsequent administrative actions and corrections would be unworkable, effectively freezing the tax rolls or forcing the County to perpetuate known errors.[219] The legislature's use of "projected" in HB242 accounts for this reality. It signifies that the revenue neutrality check in HB242 was a time-measured mandate based on the moment of rate setting.

HB242 does not bar the County's efforts to correct errors in its own tax classification records. The revenue neutrality requirement functioned as a one-time

---

[218] *See* Defs.' Ex. J (Transcript, August 12, 2025 Special Legislative Session) 193 (discussing how over 5,000 assessments were undergoing the appeals process); Defs.' Ex. D (IAAO Standard on Mass Appraisal of Real Property) § 3.3.4 (stating that "[p]roperty characteristics data should be continually updated in response to changes brought about by new construction, new parcels, remodeling, demolition, and destruction"); Defs.' Ex. M (IAAO Standard on Property Tax Policy) § 4.1.5 (discussing the standard for appeal).

[219] *See* Defs.' Answering Br. 37; Tyler Report 3 (cautioning that various "events, conditions, or circumstances" after-the-fact may "affect[] . . . properties' market value[,]" and that a property's "estimated value is based upon estimates and assumptions which are inherently subject to uncertainty and variation, depending upon evolving events").

limitation applicable to the School Boards when they set their new rates using available County data. Count V fails.

## III. CONCLUSION

The General Assembly's enactment of HB242 represented a swift policy response to an unexpected and significant tax burden shift onto residential homeowners after a court-ordered reassessment. The plaintiffs, representing non-residential property owners who now bear a larger share of that burden, have challenged the legislature's solution and its implementation. For the above reasons, each of the plaintiffs' claims fails, and judgment is entered for the defendants on all counts. The only relief warranted is that the County must include with its tax bills a notice of any reclassification and a description of the new policy for disputing reclassifications. The plaintiffs' request for declaratory and injunctive relief is otherwise denied. The parties are to confer on a proposed final order to implement this decision, which must be filed by noon tomorrow unless the parties request additional time.